THE NEW YORK AND CHICAGO GRAIN AND STOCK EXCHANGE

*v.*

THE BOARD OF TRADE OF THE CITY OF CHICAGO *et al.*

*Filed at Ottawa January 25, 1889.*

1. BOARD OF TRADE OF CHICAGO—*a private corporation—character of its dealings, as of a private and public nature.* The Board of Trade of the city of Chicago is a private corporation, and was incorporated for the purpose of affording facilities to its members in doing business with each other. In their transactions upon the floor of the exchange they deal as principals with each other, but in respect to others than members of the board they are brokers and commission merchants for the producers, consumers, shippers and merchants whom they represent.

2. SAME—*market quotations and reports—how far considered of public interest, and subject to public control—and herein, of private property being charged with a public duty.* The market news of the proceedings, etc., of the Chicago Board of Trade, is a species of property, and if the statistics with reference to the individual business of the members of the association, and the aggregate business of its members, had from the inception of the transactions of the board been gathered and compiled at the expense of its own members, it might be that it would have been strictly private property, held in trust by the board for the use and benefit of such members, and wholly free from any public interest therein.

3. The fact, however, that the Board of Trade is a private corporation, and that the dealings between its members are private business, such as is transacted between dry goods, grocery and commission merchants, and that the statistics of these dealings collected by agents of the board are private property, is not conclusive that such statistics are not charged with a public interest, and that there is no duty due the public in respect thereto.

4. Where private property is devoted to a public use, and becomes affected with a public interest, it ceases to be *juris privati* only, and is subject to public regulation. Property becomes clothed with a public interest when used in such a manner as to make it of public consequence, and affect the community at large.

5. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must, to the extent of such interest, submit to be controlled by the public for the common good, as long as he maintains the use. He may withdraw his grant by discontinuing the use.

6. So assuming the market quotations and reports of the Board of Trade are not only property, but also private property, of the board, yet if they have been so used by the board, and by the telegraph companies, with the knowledge and consent of the board, as to become affected with a public interest, then they are subject to such public regulation by the legislature and the courts as is necessary to prevent injury to such public interest. In this respect there is no difference between property of private corporations and individuals.

7. SAME—*unjust discriminations—in supplying market quotations and reports.* This doctrine, as applied to the matter of the market quotations and reports of the board, forbids that a monopoly shall be made of them, by furnishing them to some and refusing them as to others who are equally willing to pay for them and be governed by all reasonable rules and regulations, and such doctrine will prevent the board, or the telegraph companies acting with it, from unjustly discriminating in respect to the persons who will be allowed to receive them.

8. The Chicago Board of Trade having so conducted its affairs for many years as to create a standard market for agricultural products, and by acting in concert or combination with telegraph companies, and thereby having built up a system for the instantaneous and continuous indication of that market and its fluctuations, until the public, and all persons dealing in such products, have conformed to this system, and until, in consequence of the general use of that system and the usage of trade, such instantaneous market quotations have become necessary to the safe and successful transaction of business, such system will have become affected with a public interest, and such Board of Trade can not thereafter, in the furnishing of such quotations, make any unjust discrimination between persons willing to pay therefor and to conform to all reasonable rules and regulations.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. JOHN C. BAGBY, Judge, presiding.

Messrs. BISBEE, AHRENS & DECKER, for the appellant:

When private property is used in such a manner as that the public interest is affected by it, then, reflexively, the property or franchise, or whatever it may be, is also affected with a public interest, and ceases to be *juris privati*. *Munn* v. *Illinois*, 94 U. S. 113; *Hocton* v. *State*, 105 Ind. 250; *State* v. *Telegraph Co.* 17 Neb. 126; *Telegraph Co.* v. *Telegraph Co.* 96 U. S. 9; *State* v. *Telegraph Co.* 36 Ohio St. 296; 23 Fed.

Rep. 239; *Telegraph Co.* v. *Telegraph Co.* 44 Am. Rep. 237; *Allmett* v. *Inglis,* 12 East, 527.

The property, however transferred by the Board of Trade to the telegraph company, and however transmitted by the telegraph company, is property which, from its very nature, the public has an interest in, because, first, it has been created in such a manner as to make it a matter of public interest; and second, the Board of Trade has allowed it to be used in such a way as to make it a matter of public interest.

Mr. SIDNEY SMITH, for the appellees:

The Board of Trade is a private corporation. It was incorporated, not for the purpose of conducting business as a corporation, but for the purpose of affording better facilities to members in the conduct of their private business and dealings with each other. It is authorized to establish rules for the management of its business. Under this power, section 20 of rule 4 was adopted. If this rule is valid, that is an end to this suit. It is reasonable, and germane to the purposes for which the board was created. Such rules are repeatedly held good. *People* v. *Board of Trade,* 45 Ill. 112; 80 id. 134; *Pitcher* v. *Board of Trade,* 121 id. 412.

Under this rule, the market news and statistics are collected and compiled at the expense of the members of this association, and are as much their property, in their associated capacity, as is the exchange hall itself in which their business is transacted. If authority be needed in support of this self-evident proposition, it is to be found in *Kiernan* v. *Manhattan Quotation Co.* 50 How. Pr. 194, and cases cited.

The Board of Trade of the city of Chicago has the legal right to control its own market news and these statistics, gathered and compiled at its own cost and expense from funds contributed by its members, and to determine what telegraphic dispatches touching the same it will send directly from the floor of its exchange during business hours, and to whom they

shall be sent, or whether it will send any dispatches whatever. *Stock Exchange* v. *Board of Trade*, 15 Fed. Rep. 847 ; 22 id. 23 ; *Bryant* v. *Telegraph Co.* 17 id. 826.

Mr. JUSTICE BAKER delivered the opinion of the Court:

The objects of the Board of Trade of the city of Chicago are, "to maintain a commercial exchange, and to promote uniformity in the customs and usages of merchants; to inculcate principles of justice and equity in trade; to facilitate the speedy adjustment of business disputes; to acquire and to disseminate valuable commercial and economical information, and, generally, to secure to its members the benefits of co-operation in the furtherance of their legitimate pursuits." The association existed for some years prior to the 18th day of February, 1859, as a mere voluntary and unincorporated society of persons engaged in the grain, produce and commission business, and at that date it was incorporated by a special act of the General Assembly of the State of Illinois, and was given power and authority to do and carry on business such as is usual in the management of boards of trade or chambers of commerce, and the specific powers enumerated in the act of incorporation. Among the express powers delegated was authority "to establish such rules, regulations and by-laws for the management of their business, and the mode in which it shall be transacted, as they may think proper."

The growth and progress of the association in commercial influence has been commensurate with that of the city in which it is located. The initiation fee for admission to it is $10,000, and it has some two thousand members. It maintains an exchange hall, upon the floors of which, between certain prescribed hours of each business day, the business of its members is transacted. It has been said, and with much show of reason, that the floors of this exchange hall stand in the gateway of commerce. The members of the board meet thereon

to buy and sell; their trading is by open *viva voce* bidding; and when a purchase and sale is made, memoranda thereof are taken by both parties to the transaction.    Four-fifths of the grain and provisions produced in the States and territories of the Northwest are bought and sold in this market, and the business there done is so vast in its proportions that it fixes the market prices of grain, breadstuffs and meats for the extensive territory that is tributary to Chicago, and seriously affects, and to a considerable extent controls, the values of the necessaries of life throughout the United States and the civilized world.

For many years prior to August, 1883, the Board of Trade permitted the Western Union Telegraph Company, by its agents and servants in that behalf, to occupy and use its exchange hall, and there collect and transmit, without any restriction whatever, reports of the dealings, fluctuations and changes of the market on the board.    This information was sent by telegraph throughout the country, and delivered, without discrimination, to all persons who desired and would pay for the same.    There were numerous customers of this commercial news department of the business of the telegraph company, and they were scattered over the land, wherever the business of buying and selling grain and provisions was followed.    The Western Union Telegraph Company then had, and still has, a lease upon and control of the Gold and Stock Telegraph Company, which latter corporation, in turn, had and has a monopoly of the telegraphic instruments known as "tickers." Telegraphic circuits were established by the Western Union Telegraph Company in Chicago, and in other principal cities, and by means of Morse instruments and these tickers, market information passed to every office and place of business connected by wire with one of these circuits, and was automatically registered, so that every merchant or dealer provided with these instrumentalities, wherever his place of business might

be, was instantaneously, and from minute to minute, and from hour to hour, during the business sessions of the Board of Trade, informed of all fluctuations and changes in the market prices of grain and other products, as they occurred.

On the 29th of August, 1883, the Board of Trade amended its standing rules by adopting what is known as section 20 of rule 4, which is as follows:

"The board of directors shall provide an efficient corps of market reporters, whose duty it shall be, under such regulations as may be prescribed for their government, to ascertain the current market prices of such commodities as are dealt in by members of the association, during the hours for trading prescribed by these rules, the reporting of which may be desired by any considerable number of correspondents, and also all changes which may occur in the same from time to time; such reports to be frequently communicated by telegraph to such approved correspondents in the city of Chicago, or elsewhere, as may desire the same, and are willing to pay necessary charges for compiling and transmitting them by telegraph, under such arrangements as may be made by the board of directors with any telegraph company for the performance of the service of transmission. The forwarding of such reports to any particular individual, firm or corporation shall be only on the condition that it is an accommodation service, in which the Board of Trade assumes no responsibility beyond reasonable care in their compilation, and one that may be performed at the pleasure of the board, or, if performed, may be discontinued or withheld, with or without previous notice. Any individual, firm or corporation, before being supplied with the reports herein provided for, shall make an application for the same, in such form or manner as may be authorized by the board of directors, or by a committee appointed by it for that purpose, before any reports are forwarded to the applicants. A list of all correspondents to whom such reports are sent shall be kept on file in the office of the secretary of the board,

and shall be subject to the inspection of any member desiring to do so."

Since the adoption of this rule, the board, under a contract or arrangement with the Western Union Telegraph Company, has employed a corps of market reporters, who collect and transmit from the floor of the exchange, over a wire owned by it, the occurrences on the floor of the exchange, showing the fluctuations and changes of the market right along, just as they transpire during the day, to the central office of the said telegraph company. From this office such information is immediately re-transmitted over the ticker circuits in the city, and over telegraph wires to different points.

The expense to the board of its corps of market reporters is $10,000 a year, and the telegraph company pays to the board $750 a month, making $9000 per annum, for the market quotations, and the telegraph company collects compensation from the persons receiving the dispatches or connected with the ticker circuits. The board furnishes to the telegraph company, from day to day, a list of the names of the approved correspondents, some thirteen hundred or fourteen hundred in number, to whom, and to whom only, the market reports are to be transmitted, and they are sent to these designated parties only. The theory of the Board of Trade and of the telegraph companies is, that this commercial information, starting with the opening of business in the morning, and giving the transactions on the floors of the exchange, and the fluctuations and changes in the market from minute to minute and hour to hour, until the close of the business day, is a private telegraphic message sent by the board to each of the persons designated in the list furnished in the morning; and on this theory, the name of an officer of the board is added to the information collected, and sent to the telegraph company, as evidence that the matter which has been sent in sections during the day is a telegraphic dispatch sent by authority of the Board of Trade, as its own private message.

The appellant corporation, the New York and Chicago Grain and Stock Exchange, is organized under the laws of the State of Illinois, for the purpose of doing business in buying and selling grain on commission, and on the 29th of April, 1885, its place of business was at No. 140 Monroe street, Chicago, and it had in use at said place, in its business of buying and selling grain on commission, one Morse instrument and two tickers, which were connected with the wires of the Western Union Telegraph Company, and by means of which the market information in relation to the changes and fluctuations of the market on the Board of Trade of Chicago was transmitted and delivered to it instantaneously and continuously during business hours, and which information it was using in and about its business. At and before the time of the filing of the bill of complaint herein, the appellant, then being in receipt of the market information in respect to the transactions on the Board of Trade, demanded the continuance of such information, and offered to pay for the same, and submit to all reasonable requirements in relation thereto. Appellees, however, insisted upon their right to remove the telegraphic instruments and sever the wire connecting its place of business with the ticker circuit. They threatened and were about to deprive appellant of the use of the wire and instruments, and withhold from it the market reports, and thereupon appellant exhibited this bill of complaint, and upon the ground the contemplated conduct and proceedings of appellees, the Board of Trade and said telegraph companies, would be disastrous to its business, and would produce irremediable injury and damage, obtained a preliminary injunction in the circuit court of Cook county. At a subsequent term of the court the cause was heard, on bill, answers, replications and proofs, and the court found that appellant was not entitled to the relief prayed for in its bill, and said bill was dismissed for want of equity, and a decree rendered against appellant for costs. This finding and decree was afterward affirmed in the Appellate Court

for the First District, and the cause is now here on appeal from the judgment of the latter court.

The contention of the Board of Trade is, that it is strictly a private corporation, and that both the individual and aggregate business of its members is essentially private business, and that the market news and statistics collected and compiled at the expense of the association are the private property of the association, and that it has a legal right to control such market news and statistics, and determine what telegraphic dispatches touching the same it will send directly from the floor of its exchange during business hours, and to whom they shall be sent, or whether it will send any such dispatches whatever. The Board of Trade is a private corporation, and it was incorporated for the purpose of affording facilities to its members in doing business with each other. In their transactions upon the floors of the exchange they deal as principals with each other, but in respect to the outside world they are brokers and commission merchants for the producers, consumers, shippers and merchants whom they represent. For many years the board has so used its franchises, and its members have so conducted their business, as that it has become of vast commercial influence, and fixes the market values of grain and agricultural products for a large territory, and the fluctuations in prices upon its floors powerfully affect the market prices of the necessaries of life throughout the country and the world. The great power and influence which the board possesses in dictating market values, are owing to the vast aggregation of products which are drawn to its portals for a market, and are bought and sold upon its floors, and which pay tribute and toll, in the shape of commissions, to its members. The great bulk of this business,—though in form, and as between the members, the mere private and individual dealings of such members,—is in reality the business of the numerous producers, consumers, merchants and shippers for and on behalf of whom these members deal. A potential

11—127 ILL.

factor in attracting this accumulation of business to the halls of the exchange, and in vesting the board with this power to regulate and determine the market prices of grain and provisions, is the fact that many years ago the board admitted and invited the telegraph companies, which are *quasi* public corporations, to the floors of the exchange, and permitted and encouraged them to gather market quotations, showing the changes and fluctuations in the prices of the various products as they occurred, and send instantaneous information from the floors of the board, by means of telegraph lines and instruments, to all the principal towns and cities, and by means of ticker circuits to the places of business of all persons desirous of such information, which information was furnished to all persons and corporations, without discrimination, who were willing to receive and pay for the same. In this way the business of the country in buying and selling agricultural products has been brought under the control of the market values for such products as fixed and determined on the Board of Trade, and the business of dealing in such products has been brought to conform to the method of receiving instantaneous and continuous market reports, inaugurated, and for years persisted in, by the Board of Trade and the telegraph companies. This market news is a species of property, and if the statistics with reference to the individual business of the members of the association, and the aggregate business of its members, had from the start been gathered and compiled at the expense of its members, and for their sole use, it may be it would have been strictly private property held in trust by the board for the use and benefit of such members, and wholly free from any public interest therein. But the board did not so exercise its franchises and so conduct its business, but admitted the telegraph companies to the floor of its exchange, and permitted and encouraged them, from day to day and year after year, to gather these statistics of the dealings on the board, and telegraph them, immediately

as they were made, throughout the land, to whomsoever would pay for such information, until the business of the country had adapted itself to these means and appliances, and the point was reached when the quotations upon the board were puissant to determine the market values of the products of the country, and all persons dealing in such products could not, without the knowledge and benefit of these immediate quotations, intelligently and safely so deal.

The facts that the Board of Trade is a private corporation, and that the dealings between its members are private business, such as is transacted between dry goods, grocery and commission merchants, and that the statistics of these dealings, collected as we have stated, are private property, are not conclusive that such statistics are not charged with a public interest, and that there is no duty due the public in respect thereto. In the case of *Munn* v. *People of Illinois*, 94 U. S. 113, the Supreme Court of the United States recognized and followed the doctrine, that when private property is devoted to a public use, and becomes affected with a public interest, it ceases to be *juris privati* only, and is subject to public regulation. The court there said: "Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created."

Assuming these market quotations and reports are property, and the private property of the Board of Trade, yet if they have been so used by the board, and by the telegraph companies with the knowledge and consent of the board, as to become affected with a public interest, then they are subject to such public regulation by the legislature and the courts as is necessary to prevent injury to such public interest. The doc-

trine in question has application both to the property of individuals and of corporations, and it is therefore immaterial that any such corporation may be a mere private corporation. If the interest is public, then it is necessarily, to all alike, common to all, and upon equal terms. The doctrine, as applied to the matter of these market quotations, would forbid that a monopoly should be made of them by furnishing them to some and refusing them to others who are equally willing to pay for them and be governed by all reasonable rules and regulations, and would prevent the Board of Trade or the telegraph companies from unjustly discriminating in respect to the parties who will be allowed to receive them.

The market information here involved is not collected by the board merely for the use of the members of the association. For many years it was gathered and disseminated by the telegraph companies, and sent to all alike who would pay for it, wholly regardless of any question of membership in the board. The change that has been made by section 20 of rule 4, in respect to this commercial news department, seems to be more colorable than substantial, and appears to be intended merely to enable the board to make a monopoly of such news. At first the telegraph companies, by their paid agents, gathered the statistics, and telegraphed them from the floors of the exchange. Now, the board appoints and pays the agents who collect the statistics and transmit them to the central telegraph office of the Western Union Telegraph Company, from whence they are distributed to the approved correspondents. But nine-tenths of the expense of this service of collecting the market reports is refunded to the board by the telegraph company.

The question here is not one of withholding altogether instantaneous quotations and information respecting the prices at which grain and provisions are being sold upon the market of the exchange, nor one of discriminating between its own members and such persons as are not members, in giving such

information.   Before the board itself assumed to control the sending of this news, no discrimination was made in distributing it between those who were and those who were not members of the board, and since the change was made, a very large proportion of the approved correspondents are not members, and the rule contemplates that persons other than members should be such correspondents.   The question is, can the board so conduct its affairs for a long term of years as to create a standard market for agricultural products, and, acting in concert or combination with the telegraph companies, build up a great system for the instantaneous and continuous indication of that market and its fluctuations, until the public and all persons dealing in such products conform their business to this system, and until, by the usage and custom of merchants, thus advanced by the methods adopted by the board and telegraph companies, such instantaneous market quotations become necessary to the successful and safe transaction of business, and until such system has become impressed and affected with a public interest, and then be allowed to discriminate between persons and parties, and, where all alike are willing to conform to reasonable rules and requirements, and pay for the information desired, say that one shall and another shall not have such information.   If the board has such right, and these corporations are lawfully permitted so to do, then they have the power to create monopolies, and dictate who shall deal in the agricultural products of the country, and at will impoverish or enrich merchants, shippers and producers.

It is vain to say that the ordinary newspaper reports of the state of the market are all that are necessary to legitimate dealers in grain and provisions.   The business of the country has outgrown such condition, and this very largely through the methods adopted and introduced by appellees themselves. The fact that fourteen hundred persons, firms and corporations are in receipt of these instantaneous market reports, and

are willing to pay therefor the large fees and charges demanded of them for the receipt of the same, is proof positive that a business advantage is gained by immediate knowledge of the condition of the market. The persistent efforts of the Board of Trade itself to control these market reports are an indication of their estimate of their value.

We do not wish to be understood as holding that the Board of Trade is bound, by law, to continue the business of collecting, and furnishing to the public, market quotations, or that it may not voluntarily abandon such business; but we hold, that so long as it continues to carry it on, either directly or indirectly, it must do so without unjust discrimination as to persons, and must furnish market quotations to all who may desire to obtain them for lawful purposes, and upon the same terms.

There is no question involved in this case of gambling contracts, or of so-called "bucket shops." There is no evidence in the record tending to show that appellant is engaged in a gambling business or dealing in "puts" and "calls," and it is admitted that the business it is doing is not in violation of law.

We think the case made by the bill of complaint and the proofs brings it within the rule announced by the Supreme Court of the United States in *Munn* v. *People of Illinois, supra,* and, in our opinion, it was error in the circuit court to dismiss the bill for want of equity, and error in the Appellate Court to affirm the decree of dismissal.

The judgment of the Appellate Court and the decree of the circuit court are reversed, and the cause is remanded to the circuit court for further proceedings in conformity with this opinion, and with leave to both parties to take such further testimony as they may deem advisable.

*Judgment reversed.*