# THE INTER-OCEAN PUBLISHING COMPANY

## *v.*

# THE ASSOCIATED PRESS.

*Opinion filed February 19, 1900—Rehearing denied April 6, 1900.*

1. CORPORATIONS—*unused charter powers are important in determining nature of corporation.* That a corporation has power, under its charter, to purchase, lease or erect telegraph and telephone lines is important in determining the nature of the corporation, even though such power has not yet been used.

2. SAME—*the business of a telegraph company is impressed with public interest.* The business of a telegraph or telephone company is impressed with a public interest to such an extent that no discrimination in the conduct of its business can be made against particular persons or corporations.

3. SAME—*effect where private property is devoted to public use.* The owner of property which is devoted to a use in which the public is interested, in effect grants to the public an interest in such use, and must to that extent submit to be controlled by the public for the common good, so long as such use is maintained.

4. SAME—*Associated Press must furnish news for publication to all alike.* The private corporation known as the Associated Press, by gathering news for the sole purpose of selling the same for publication, has devoted its property to a public use, and can make no discrimination against persons or corporations who wish to purchase, for purposes of publication, news and information which it was created to furnish.

5. SAME—*obligation of corporation to serve public does not rest upon its contracts.* The obligation of a corporation charged with a public interest does not arise from nor rest upon contracts made by it in conducting its business, but grows out of the fact that the corporation is discharging a public duty, or a private duty which has been so conducted that the public has become interested therein.

6. MONOPOLY—*restrictions by Associated Press upon right of members to obtain other news are void.* The restrictions attempted to be imposed by the Associated Press, through its contracts and by-laws, upon the right of members to purchase news from other agencies which such corporation may declare to be antagonistic, are null and void, as tending to create monopoly and restrict competition.

7. INJUNCTION—*Associated Press may be enjoined from refusing to furnish its news reports.* The Associated Press may be enjoined from refusing to furnish news reports to a member who has contracted therefor and who will suffer irreparable injury if deprived thereof,

where the only ground for refusal is based upon the complainant's violation of illegal provisions in his contract, and the by-laws of the corporation restricting him from purchasing news reports from antagonistic agencies.

*Inter-Ocean Pub. Co.* v. *Associated Press,* 83 Ill. App. 377, reversed.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. A. N. Waterman, Judge, presiding.

Knight & Brown, for appellant:

Illegal by-laws are not binding on a member though assenting thereto. *Vierling* v. *Savings Ass.* 179 Ill. 527; *People* v. *Cotton Exchange,* 15 N.Y. 216; *People* v. *H. F. B. Society,* 24 How. Pr. 221; *Leake* v. *Harris,* 2 Brewst. 271.

Appellee, by reason of the provisions of its charter giving to it the power of eminent domain and the nature of its business, is bound to serve appellant without discrimination. *Stock Exchange* v. *Board of Trade,* 127 Ill. 153; *Danville* v. *Danville Water Co.* 178 id. 299; 180 id. 275; *Water Co.* v. *Fergus,* 178 id. 571; *Wagner* v. *Rock Island,* 146 id. 139; *Munn* v. *People,* 94 U. S. 113; *Budd* v. *New York,* 143 id. 517; *People* v. *Telegraph Co.* 166 Ill. 15; *People* v. *Railroad Co.* 178 id. 594; *Water-Works Co.* v. *State,* 46 Neb. 194; *People* v. *New York,* 117 N.Y. 1; *Smith* v. *Telegraph Co.* 42 Hun, 454; *Friedman* v. *Telegraph Co.* 32 id. 4; *Telegraph Co.* v. *Call Pub. Co.* 26 L. R. A. 622; *Nash* v. *Page,* 80 Ky. 539; *Telegraph Co.* v. *Telegraph Co.* 61 Vt. 241; *Webster Telegraph case,* 17 Neb. 136.

Appellee, in the conduct of its business and as shown by its by-laws and contracts, is, and has created to itself, a monopoly, and is violating the laws of the State of Illinois, thereby subjecting its charter to forfeiture, against which any stockholder has the right to an injunction. *Holden* v. *Alton,* 179 Ill. 318; *Adams* v. *Brenan,* 177 id. 194; *Fishburn* v. *Chicago,* 171 id. 338; *Minneapolis Tribune Co.* v. *Associated Press,* 83 Fed. Rep. 350; *People* v. *Live Stock Exchange,* 170 Ill. 556; *Craft* v. *McConoughy,* 79 id. 348; *United*

*States* v. *A. P. & S. Co.* 85 Fed. Rep. 271; *Bishop* v. *Preservers' Co.* 157 Ill. 284; *Ford* v. *Milk Dealers' Ass.* 155 id. 166; *People* v. *Milk Exchange,* 39 N. E. Rep. 1062; *People* v. *Gas Trust,* 130 Ill. 268; *More* v. *Bennett,* 140 id. 69; *Distilling Co.* v. *People,* 156 id. 448; *Butchers' Union* v. *Crescent City,* 111 U. S. 746; *Land Co.* v. *Aldrich,* 86 Ill. 504; *Stewart* v. *Transportation Co.* 17 Minn. 398; *Davis* v. *Railroad Co.* 131 Mass. 259.

Appellee should have been enjoined from depriving appellant of the news service. *Stock Exchange* v. *Board of Trade,* 127 Ill. 153; *Smith* v. *Telegraph Co.* 42 Hun, 454; *Friedman* v. *Telegraph Co.* 32 id. 4; *Houston* v. *Rutlinger,* 91 Ky. 333; *Walker* v. *Converse,* 148 Ill. 622; *McMillan* v. *Jones,* 105 id. 194; *Cushman* v. *Bonfield,* 139 id. 219; *Holden* v. *Holden,* 24 Ill. App. 196.

Appellant is entitled to receive the news service for the reason that appellee's business has become impressed with the public use, and that public policy forbids that it should make any discrimination in its patrons. There has been given to it the power of eminent domain, and, considering the nature of its business, it must necessarily be held that it has devoted its business to a public use. *Stock Exchange* v. *Board of Trade,* 127 Ill. 153; *Wagner* v. *Rock Island,* 146 id. 139.

JOHN P. WILSON, for appellee:

An injunction restraining a breach of the contract is a negative specific performance of the contract. *Railway Co.* v. *Railway Co.* 171 Ill. 391; *Welty* v. *Jacobs,* id. 624.

If the contract is valid appellant is not entitled to a specific performance, as by its bill it admits having violated and disregarded its essential provisions. If appellant's covenants, which were the consideration which induced the making of the contract by appellee, were illegal and unlawful because in restraint of trade and prohibited by the statutes of Illinois and of the United States, the whole contract is void, and no rights can be claimed or enforced thereunder by appellant. *Henderson*

v. *Palmer,* 71 Ill. 579; *Railway Co.* v. *Railway Co.* 171 id. 391; *Critchfield* v. *Paving Co.* 174 id. 466; *Geer* v. *Frank,* 79 id. 575; *Woodruff* v. *Hinman,* 11 Vt. 592; *Daniel* v. *Daniel,* 6 Dana, 91; *Collins* v. *Merrill,* 2 Metc. (Ky.) 163; *Kimbrough* v. *Lowe,* 11 Bush, 556; *Carleton* v. *Whitcher,* 5 N. H. 200.

The nature of the contract is such that appellee could not have enforced specific performance on its part, and the contract could not, therefore, be specifically enforced by appellant. *Welty* v. *Jacobs,* 171 Ill. 624; Waterman on Specific Per. sec. 196; *Lancaster* v. *Roberts,* 144 Ill. 213; Fry on Specific Per. secs. 440, 441; *Marble Co.* v. *Ripley,* 10 Wall. 399; *Iron Age* v. *Telegraph Co.* 83 Ala. 498; *Railway Co.* v. *Railway Co.* 13 Ohio St. 544.

Even if appellee could be compelled to furnish a news service to appellant in the absence of a contract, injunction is not the proper remedy. *Baxter* v. *Board of Trade,* 83 Ill. 146; *Menard* v. *Hood,* 68 id. 127; *Wangelin* v. *Goe,* 50 id. 459; *Fisher* v. *Board of Trade,* 80 id. 85.

T. A. MORAN, also for appellee:

The business of the Associated Press is a private business. No public use is impressed upon it and it is in no way affected with a public right or interest. The transmission of its news has been, at all times since its first organization, to particular persons who held contracts with it, and never has been to the general public. *Stock Exchange* v. *Board of Trade,* 127 Ill. 153; *Kiernan* v. *Telegraph Co.* 50 How. Pr. 194; *Telegraph Co.* v. *Todd,* 17 Hun, 548.

The contract between the complainant and the defendant in this case is not bad as in restraint of trade and is not against public policy. The specific by-law and stipulation in the contract set out in the bill has been held valid. *Matthews* v. *Associated Press,* 136 N. Y. 333; *Carter* v. *Allen,* 43 Fed. Rep. 208; *Diamond Match Co.* v. *Rubel,* 106 N. Y. 473.

All the stipulations of one party to the contract together constituted the consideration for the stipulations

or undertakings of the other party. If, then, as complainant contends, some portions of its agreement were against public policy, it cannot have the aid of a court of chancery in the direct or indirect specific performance of the balance of the contract, and the injunction was therefore properly denied and the bill dismissed. Fry on 'Specific Per. secs. 477, 480; Leake on Contracts, 677, 678; *Reed* v. *Brewer*, 37 S. W. Rep. 418; *Bixby* v. *Moore*, 51 N. H. 402; *Bishop* v. *Preservers' Co.* 157 Ill. 284; 9 Am. & Eng. Ency. of Law, 81; *Wall Paper Co.* v. *Hobbs*, 35 N. Y. Sup. 932; *Bank* v. *King*, 42 N. Y. 87; *Braitsch* v. *Guelick*, 37 Iowa, 212; *Moore* v. *Bonnet*, 40 Cal. 251; *Greer* v. *Storer*, 77 Fed. Rep. 1; *Wudow* v. *Webb*, 20 Ohio St. 431.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The Inter-Ocean Publishing Company, a corporation organized under the laws of the State of Illinois, is engaged in publishing two newspapers in the city of Chicago, known as *"The Daily Inter-Ocean"* and *"The Weekly Inter-Ocean,"* which have a wide circulation in the States and Territories of the United States. The Associated Press is a corporation organized under the laws of the State of Illinois in 1892. The object of its creation was, "to buy, gather and accumulate information and news; to vend, supply, distribute and publish the same; to purchase, erect, lease, operate and sell telegraph and telephone lines and ôther means of transmitting news; to publish periodicals; to make and deal in periodicals and other goods, wares and merchandise." It has about eighteen by-laws with about seventy-five subdivisions thereof. The stockholders of the Associated Press are the proprietors of newspapers, and the only business of the corporation is that enunciated in its charter, and is mainly buying, gathering and accumulating news and furnishing the same to persons and corporations who have entered into contract therefor. It may furnish news

to persons and corporations other than those who are its stockholders, and the term "members," used in its by-laws, applies to proprietors of newspapers, other than its stockholders, who have entered into contracts with it for procuring news. It does not appear that it has availed itself of any of the powers conferred by its charter other than that of gathering news and distributing the same to its members. Under the by-laws of appellee the Inter-Ocean Publishing Company became a stockholder. Among the by-laws having reference to stockholders are the following:

"Article 11.—Sec. 8. *Sale or purchase of specials.*—No member shall furnish, or permit any one to furnish, its special or other news to, or shall receive news from, any person, firm or corporation which shall have been declared by the board of directors or the stockholders to be antagonistic to the association; and no member shall furnish news to any other person, firm or corporation engaged in the business of collecting or transmitting news, except with the written consent of the board of directors."

"Article 14.—Sec. 1. *Board may suspend.*—The board of directors shall have the power, by a two-thirds vote of the whole board, to suspend a member or impose upon him a fine of not exceeding $1000 for furnishing news to any person or association antagonistic or in opposition to the Associated Press, or for purchasing news from any person or organization formally declared by the board of directors or by the stockholders of the association, at any annual or special meeting, to be in such antagonism or opposition, or for any other violation of the by-laws or his contract: *Provided, always,* that ten days' notice, in writing, of a complaint be first served upon the offending member; and said member shall have an opportunity to be heard in his own defense, and if said member shows that the offense was unintentional, and shall have discontinued the same, he shall not be suspended."

On March 2, 1893, the Associated Press entered into an agreement with the Inter-Ocean Publishing Company, by which it sold to the latter its night news report for publication in the two newspapers for the term of ninety-two years, which the Inter-Ocean company agreed to receive and pay for at the rate of $102 per week, which sum was liable to be increased fifty per cent. The Associated Press agreed to furnish to the Inter-Ocean company local and telegraphic news within a radius of sixty miles of Chicago, in accordance with its by-laws. The contract between the Inter-Ocean company and the Associated Press, among other provisions, contained the following:

"*Sixth*—Said party of the second part covenants and agrees that it will not furnish, before publication, any news to any person or corporation engaged in the business of collecting or transmitting news, except upon the written consent of the board of directors of the party of the first part first had and obtained; and that it will not furnish to any person, any of the news received by it under this contract before publication by it; and that it will not furnish its special or other news to or receive news from any person or corporation which shall have been declared by the board of directors of said party of the first part antagonistic to said party of the first part, after having received notice of such declaration.

"*Seventh*—It is further mutually agreed between the parties hereto, that the rights, duties and obligations of the respective parties hereto, except as hereinbefore specifically provided for, shall be controlled and governed by the by-laws of said party of the first part now or hereafter in force, during the life of this contract; and that the right to receive news under this contract may be suspended or terminated in the manner and for the causes specified in said by-laws.

"*Ninth*—Said party of the first part promises and agrees not to furnish any news report to any newspaper published in the said territory described in this contract

not now entitled to receive the same under the by-laws of said party of the first part, without the written consent of the said party of the second part or its assigns.

"*Tenth*—Said party of the second part has assigned and transferred its stock in the said party of the first part to the said party of the first part, which stock is to be held by said party of the first part as security for the performance by said party of the second part of this contract on its part. Said party of the second part, in consideration of the making of this contract by said party of the first part, hereby covenants and agrees that it will not sell or part with any interest in said stock to any party who shall not be the proprietor of a newspaper which shall at the time be on the membership roll of said party of the first part, and that it will keep and observe and perform all the requirements of the by-laws of said party of the first part now or hereafter in force during the life of this contract."

Contracts of substantially the same character have been entered into from time to time between the Associated Press and most of the leading newspapers throughout the United States, to whom, under its charter and by-laws and under its contracts, it sells and vends its news. Similar associations for gathering and selling and vending news, to a limited extent, exist in other cities than Chicago, but none of them so widely extended. Among these are the Sun Printing and Publishing Association of New York City, the New York Sun of New York City, and the Laffan News Bureau of New York City. These three latter associations have been declared to be antagonistic to the Associated Press by the board of directors of the latter. News of an important character not gathered by the Associated Press was gathered by a certain alleged antagonistic association, and the Inter-Ocean Publishing Company, for the purpose of furnishing its readers with information and news gathered from various points and sources, in addition to the news pur-

chased by it from the Associated Press also purchased and published news obtained by it from the Sun Printing and Publishing Association of New York City, but did not furnish news to the latter association or to any of the associations antagonistic to the Associated Press. The Chicago Herald Company and the Chicago Daily News Company made complaint to the Associated Press that the Inter-Ocean Publishing Company was publishing news procured by it from the Sun Printing and Publishing Association of New York, the New York Sun of New York City and the Laffan News Bureau of New York City, and asked that the Inter-Ocean Publishing Company's contract and section 8 of article 11 of the by-laws should be enforced. The Associated Press gave notice to the Inter-Ocean Publishing Company that a meeting of its board of directors would be held at a time and place mentioned, to take action on the complaints of the Chicago Herald Company and the Chicago Daily News Company. Before the time set for hearing the Inter-Ocean Publishing Company filed its bill for an injunction against the Associated Press from suspending or expelling it from its membership and from refusing to furnish it news according to the terms of its contract, and from doing any act or thing tending to deprive it of the news gathered by appellee, and for such other relief, general and special, as might be just and equitable.

The bill set up the facts hereinbefore stated, and set out the by-laws of the appellee in full, and alleged that the appellee had been able to control the business of buying and accumulating news in Chicago and selling the same, and has thus created in itself an exclusive monopoly in that business, and to preserve such monopoly had declared the Sun Printing and Publishing Association a rival or competitor in business and antagonistic to it, and sought to prohibit its members from buying news therefrom under pain of suspension or expulsion; alleged that appellee had at various times, by threats of suspen-

sion and expulsion, compelled divers of its members to cease buying the special news of the Sun Printing and Publishing Association under its contracts with its members. The bill set out the contracts and names of such members, and alleged that the notice served on appellant for a hearing on the complaints against it is similar to the action of appellee against other members who were forced to cease buying special news from the Sun Printing and Publishing Association; that appellant is in duty bound, both to its patrons and to the public, to publish all the news it can gather, and if not able to obtain such news from one source, it must, in justice to its patrons and the public, resort to other sources; that the news which it obtained from appellee it was unable to obtain from any other source, and appellee would not furnish the same to appellant unless it executed the contract hereinbefore mentioned, because of which appellant was forced to and did execute such contract; that appellee does not furnish all the news obtainable and desired by appellant under that contract, and to obtain such other news appellant was forced to resort to the Sun Printing and Publishing Association of New York; that the right to receive the news gathered by appellee and publish the same in its newspaper is a valuable property and property right, and appellant is forced to obtain the news not obtainable from appellee, and which is absolutely needed in publishing its newspapers, from the Sun Printing and Publishing Association; that the appellee is attempting to force appellant to cease taking news from the latter association, but to do so would work irreparable damage and injury to appellant, and would prevent it from furnishing needed, important and necessary news to the public, and would tend to create in favor of appellee a monopoly.

The appellee filed an answer to the bill. A hearing was had upon the bill and answer, both of which were sworn to, and certain affidavits which were read and used

as depositions, and a decree was rendered dismissing the bill for want of equity. On appeal to the Appellate Court for the First District the decree was affirmed, and this appeal is prosecuted.

It has been uniformly held that a telegraph or telephone company is bound to treat all persons and corporations alike, and without discrimination in its business of receiving and transmitting messages. The business of such a company is public in its nature, and a public interest is impressed thereon to such an extent that no discrimination can be made against persons or corporations. (*People* v. *Western Union Tel. Co.* 166 Ill. 15.) Where one is the owner of property which is devoted to a use in which the public has an interest, he in effect grants to the public an interest in such use, and must, to the extent of that interest, submit to be controlled by the public for the common good as long as such use is maintained. The manner in which it is devoted to a use in which the public has an interest may be very diverse and the public interest in such use may be of a widely variant character; but where the use is one in which the public is interested or has an interest, public control is necessary for the common good. (*Munn* v. *People,* 94 U. S. 113.) The appellee corporation voluntarily sought corporate existence to engage in an enterprise which invested it with, among others, the power of eminent domain. It was organized, among other things, to purchase, erect, lease, operate and sell telegraph and telephone lines,—a business which is essentially public in its nature and renders a corporation so engaged amenable to public control. Whilst, under the averments of the bill and answer and affidavits, the appellee corporation has only engaged in business to the extent of its power "to buy, gather and accumulate information and news; to vend, supply, distribute and publish the same," and has not attempted to purchase, erect, lease or sell telegraph and telephone lines, it is important to determine the char-

acter of the corporation under its charter and under the business in which it is actually engaged.

The organization of such a method of gathering information and news from so wide an extent of territory as is done by the appellee corporation, and the dissemination of that news, requires the expenditure of vast sums of money. It reaches out to the various parts of the United States, where its agents gather news which is wired to it, and through it such news is received by the various important newspapers of the country. Scarcely any newspaper could organize and conduct the means of gathering the information that is centered in an association of the character of the appellee because of the enormous expense, and no paper could be regarded as a newspaper of the day unless it had access to and published the reports from such an association as appellee. For news gathered from all parts of the country the various newspapers are almost solely dependent on such an association, and if they are prohibited from publishing it or its use is refused to them, their character as newspapers is destroyed and they would soon become practically worthless publications. The Associated Press, from the time of its organization and establishment in business, sold its news reports to various newspapers who became members, and the publication of that news became of vast importance to the public, so that public interest is attached to the dissemination of that news. The manner in which that corporation has used its franchise has charged its business with a public interest. It has devoted its property to a public use, and has, in effect, granted to the public such an interest in its use that it must submit to be controlled by the public for the common good, to the extent of the interest it has thus created in the public in its private property. The sole purpose for which news was gathered was that the same should be sold, and all newspaper publishers desiring to pur-

chase such news for publication are entitled to purchase the same without discrimination against them.

It was held in *New York and Chicago Grain and Stock Exchange* v. *Board of Trade*, 127 Ill. 153 (on p. 163): "Assuming these market quotations and reports are property and the private property of the board of trade, yet if they have been so used by the board, and by the telegraph company with the knowledge and consent of the board, as to become affected with a public interest, then they are subject to such public regulation by the legislature and the courts as is necessary to prevent injury to such public interest. The doctrine in question has application both to the property of individuals and of corporations, and it is therefore immaterial that any such corporation may be a mere private corporation. If the interest is public, then it is necessarily, to all alike, common to all and upon equal terms. The doctrine, as applied to the matter of these market quotations, would forbid that a monopoly should be made of them by furnishing them to some and refusing them to others who are equally willing to pay for them and be governed by all reasonable rules and regulations, and would prevent the board of trade or the telegraph companies from unjustly discriminating in respect to the parties who will be allowed to receive them." This principle is sustained in *Friedman* v. *Telegraph Co.* 32 Hun, 4, and *Smith* v. *Telegraph Co.* 42 id. 454. The appellee corporation being engaged in a business upon which a public interest is engrafted, upon principles of justice it can make no distinction with respect to persons who wish to purchase information and news, for purposes of publication, which it was created to furnish.

It is urged, however, that by the terms of the contract appellant cannot retain its membership and stock in the Associated Press, and have the right to purchase news accumulated by it at contract price, without complying with that part of the contract which requires appel-

lant to refrain from receiving news from any person or corporation which has been declared by the board of directors of appellee to be antagonistic to the latter, and without appellant being controlled or governed by the by-law of appellee to the same effect. The character of appellee's business is not to be determined by the contract which it made respecting the liabilities which would attend it, but by the nature of the business, its fixed legal character, growing out of the manner in which that business is conducted, and the purpose of its creation. The legal character of the corporation and its duties cannot be disregarded because of any stipulation incorporated in a contract that it should not be liable to discharge a public duty. Its obligation to serve the public is not one resting on contract, but grows out of the fact that it is in the discharge of a public duty, or a private duty which has been so conducted that a public interest has attached thereto.

In *Smith* v. *Telegraph Co. supra*, an action was brought to restrain the defendant from removing from complainant's office a ticker, or from doing any act which would in any way interfere with the receipts of quotations from the stock exchange. By one of the clauses of the contract the plaintiff agreed that the company might forthwith discontinue its service without notice, whenever, in its judgment, any breach of the terms of the contract should be made by him. It was held: "But so long as collecting and supplying quotations is carried on by them, as it is conceded to be at present, they should render equal and impartial service to those who comply with reasonable regulations. What regulations are reasonable may not in all cases be easy to determine, but there need be no hesitation in saying that the clause of their contract permitting them to discontinue the service when, in their judgment, a breach of conditions has been had, is not a reasonable regulation and affords no defense to this action. No man can be judge in his own case, and

to justify defendants in refusing to perform service there must be a reason that the court can pronounce sufficient."

In *Commercial Union Tel. Co.* v. *New England Tel. Co.* 61 Vt. 241, a question arose as to compelling a telephone company to furnish telephone service. In defense it was sought to set up a contract between the Bell Telephone Company and the respondent restricting the right to the use of their instruments, but the court held there was no right to discriminate and that the restricting clause was invalid, and it was said: "On the ground of public policy, which controls all public carriers, that clause in the contract in question is held void, so that the license stands precisely as if the restricting clause was not contained in it."

The clause of the contract in this case which sought to restrict appellant from obtaining news from other sources than from appellee is an attempt at restriction upon the trade and business among the citizens of a common country. Competition can never be held hostile to public interests, and efforts to prevent competition by contract or otherwise can never be looked upon with favor by the courts. In *People* v. *Live Stock Exchange,* 170 Ill. 556, it was said (p. 566): "Efforts to prevent competition and to restrict individual efforts and freedom of action in trade and commerce are restrictions hostile to the public welfare, not consonant with the spirit of our institutions and in violation of law."

Section 8 of article 11 of the by-laws of the appellee sought to prevent any member of the appellee association from furnishing its special or other news to or receiving such news from any person declared by it hostile. In *People* v. *Live Stock Exchange, supra,* in speaking of the power to enact by-laws, and their effect, we said (p. 570): "When a corporation is created, there goes with it the power to enact by-laws for its government and guidance, as well as for the guidance and government of its members. This power is necessary to enable a corporation

to accomplish the purpose of its creation.   But by-laws must be reasonable and for a corporate purpose, and always within charter limits.  They must always be strictly subordinate to the constitution and the general law of the land.  They must not infringe the policy of the State nor be hostile to public welfare.  *  *  *  Attempts to place restrictions on trade and commerce, and to fetter individual liberty of action by preventing competition, are hostile to public welfare and affect the interests of the people.  Such attempts by a corporation are an abuse of its corporate franchise.   Public policy requires that corporations, in the exercise of powers, must be confined strictly within their charter limits and not be permitted to exercise powers beyond those expressly conferred. The State provides for the creation of corporations.  The corporation is its creature and must always conform to its policy.   This duty on the part of corporations to do no acts hostile to the policy of the State grows out of the fact that the legislature is presumed to have had in view the public interest when a charter was granted to the corporation, and no departure from its charter purposes will be allowed which would be hurtful to the public."

The by-law of the appellee corporation above referred to is not required for corporate purposes nor included within the purposes of the creation of that corporation. To enforce the provisions of the contract and this by-law would enable the appellee to designate the character of the news that should be published, and, whether true or false, there could be no check on it by publishing news from other sources.   Appellee would be powerful in the creation of a monopoly in its favor, and could dictate the character of news it would furnish and could prejudice the interests of the public.  Such a power was never contemplated in its creation and is hostile to public interests.   That by-law tends to restrict competition, because it prevents its members from purchasing news from any other source than from itself.   It seeks to exclude from

publication, by any of its members, news procured from any other corporation or source than itself which it declares antagonistic to it. Its tendency, therefore, is to create a monopoly in its own favor and to prevent its members from procuring news from others engaged in the same character of work, and such provision is illegal and void. (*Adams* v. *Brenan*, 177 Ill. 194.) In *Holden* v. *City of Alton*, 179 Ill. 318, it was held that equity would enjoin the city from carrying out a contract for city printing at the suit of a tax-payer who was the lowest bidder on a contract, and whose bid was rejected because he did not employ members of a certain labor organization and could not show the label declared by the ordinance making such qualification to be essential, and it was held that such a combination or agreement was in violation of common right and tended to create a monopoly, and that could not be tolerated. To the same effect is *Fishburn* v. *City of Chicago*, 171 Ill. 338. The clear effect of this by-law is to create a monopoly, which renders it void.

The provisions of the contract that the appellant should purchase news from no other source, and the restrictive clause of the by-law, are both null and void, and the contract is the same as if these provisions had not been incorporated therein. Rejecting entirely these illegal provisions, on which the right to suspend the appellant as a member and to refuse to furnish it news and information gathered by the Associated Press for publication rests, no reason is presented, under the pleadings and affidavits in this case, why the appellant is not entitled to an injunction, as prayed for in its bill. The bill alleges that the deprivation of such reports by the Associated Press would cause an irreparable injury and damage to the appellant, which is sought to be prevented by the injunction prayed for in this bill.

We hold that the circuit court of Cook county erred in entering a decree dismissing the bill for want of equity, and the Appellate Court for the First District erred in

affirming the same. The judgment of the Appellate Court for the First District and the decree of the circuit court of Cook county are each reversed, and the cause is remanded to the circuit court of Cook county, with directions to enter a decree as prayed for in the bill.

*Reversed and remanded.*