# COURT OF GENERAL SESSIONS — NEW YORK COUNTY.

## December, 1919.

## THE PEOPLE v. LEO NEWMAN.

## THE PEOPLE v. LOUIS COHEN.

### (109 Misc. 622.)

(1.) CONSTITUTIONAL LAW—LEGISLATION THAT ARBITRARILY AND UNREASONABLY INTERFERES WITH SALE OF THEATRE TICKETS BY A TICKET BROKER IS UNCONSTITUTIONAL—LICENSES—THEATRES—EVIDENCE—DUE PROCESS OF LAW—CRIMINAL LAW—APPEAL—1 CODE CRIM. PRO., § 750.

Under section 750 of the Code of Criminal Procedure an appeal lies to the Court of General Sessions of the county of New York from a judgment of the City Magistrates' Court convicting the defendant of a violation of a city ordinance, even though sentence was suspended.

Legislation that arbitrarily and unreasonably interferes with the sale of theatre tickets by one engaged in the business of a ticket broker, is unconstitutional.

(2.) SAME—TICKET SPECULATORS ORDINANCE OF NEW YORK CITY.

The price-fixing provision of the "Ticket Speculators' Ordinance" of the city of New York (Code of Ordinances, chap. 3, art, 1, § 11-a) for a license to engage in the business of selling tickets of admission to exhibitions or performances conducted under licenses duly issued, is an unwarrantable interference with the inherent and constitutional rights of an individual, and is void under the constitutional provisions which guarantee all persons against deprivation of their liberty and property without due process of law.

(3) SAME.

Such provision of said ordinance is only secondary to the main purpose of limiting the price which may be charged by the ticket broker, and as a violation of said provision might result in the revocation of the license and subject the offender to fine and imprisonment, it cannot be presumed that it was intended that the licensing feature should survive the nullification of the price-fixing provision which called said section 11-a as a whole into existence, and both provisions being so connected with and dependent upon each other, and the price-fixing provision being unconstitutional, the licensing provision must fall with it.

(4) SAME.

It is essential to the validity of a city ordinance that it shall be reasonable, and said section 11-a which went into effect December 28, 1918, whereby ticket brokers carrying on business were thereafter required to pay $250 for a license which would expire May 1, 1919, and an additional fee of $250 after that date, must be held to be unreasonable on the ground that the license fee for 1919 was more than necessary to reimburse the city for issuing the license to the ticket broker and for supervision of his business.

(5) SAME.

The ordinance not having been passed pursuant to any specific authority of the Legislature nor adopted by that body the exclusion of evidence on behalf of defendant tending to show that the ordinance was unreasonable and oppressive was erroneous.

(6) GREATER N. Y. CHARTER, § 1476.

Section 1476 of the Greater New York charter which prohibits a license for a public exhibition to appeal, was not intended in the absence of legislative authority to confer upon the board of aldermen the right to prohibit an appeal by a ticket speculator from a judgment convicting him of a violation of section 11-a of the Code of Ordinances of the city of New York.

APPEAL from judgments of conviction in a City Magistrates' Court.

*Louis Marshall,* for appellants.

*Edward Swann, District Attorney, Robert S. Johnstone, Robert D. Petty* and *Edwin P. Kilroe, Assistant District Attorneys,* for respondent.

ROSALSKY, J.:

The defendant in each of the above cases appeals from a judgment of the City Magistrates' Court convicting him of a violation of section 11a, article 1, chapter 3, of the Code of Ordinances of the city of New York, generally known as the Ticket Speculators' Ordinance, in that he sold theatre tickets without having procured a license. Sentence was suspended upon them.

Prior to 1907, a defendant, convicted in the City Magis-

trates' Court, and upon whom sentence was suspended, could not appeal to this court, because the suspension of sentence was not deemed a final judgment, but section 750 of the Code of Criminal Procedure now accords him the right of appeal. People v. Magnus, 92 Misc. Rep. 80.

The appeals being of the same nature and involving the same ordinance have been jointly argued, and it will be sufficient to discuss, in a single opinion, the questions raised.

The sections of the ordinance which affect the ticket speculators or brokers are as follows:

"Section 11a. Sale of tickets by ticket offices; issue of licenses; fee; revocation; penalties. No person shall engage in the business of selling the tickets, cards or other tokens evidencing the right of admission to exhibitions or performances conducted by licensees under licenses issued by the commissioner of licenses pursuant to the preceding sections of this article; or shall open or conduct an office, agency or other place by whatever name known at which such tickets are sold or offered for sale, unless a license shall have been issued to such person by the commissioner of licenses upon the payment of the fee herein prescribed. Every license shall expire on the first day of May next ensuing the grant thereof. The fee for such a license shall be $250. A licensee under this section, or any officer or employee thereof, shall not directly or indirectly exact, accept or receive for any ticket or other token of admission to an exhibition or performance conducted by a licensee under the preceding sections of this article any greater amount than 50 cents in excess of the sum of the regular or established price or charge therefor printed on the face of such ticket, plus the amount of any tax imposed by the government of the United States upon such ticket or the right of admission thereunder. The license of any licensee under this section may be revoked and annulled in the manner provided by section 4 of this article, for any violation of this section. Any person who shall engage in any business or conduct an office, agency or other place, for which a

license is required by this section, without procuring such license, shall, upon conviction thereof, be liable to the punishment prescribed by section 13 of this article. This section shall not be deemed to require a licensee under sections one and two of this article to obtain an additional license for the sale by him of tickets of admission to a licensed exhibition or performance conducted by him."

This section was adopted by the board of aldermen December 17, 1918, and approved by the mayor on December 28, 1918, taking effect immediately.

"Section 13. Violations. Except as otherwise specifically provided therein, any person who shall violate, or refuse or neglect to comply with, any provision of this article shall, upon conviction thereof, be punished by a fine of not more than $500 or by imprisonment for not more than 6 months or by both such fine and imprisonment; and any such person shall, also for each offense, be subject to the payment of a penalty in the sum of $250, to be recovered in a civil action brought in the name of the city."

This section took effect December 19, 1907.

" Section 4. Revocation of license. Any license provided for by the preceding sections may be revoked and annulled by any judge or justice of a court of record, upon proof of a violation of any provision of this article. The proof shall be taken before such judge or justice, upon notice of not less than two days to show cause why such license should not be revoked. He shall hear the proofs and allegations in the case and determine the same summarily, and no appeal shall be taken from his determination. Any person whose license shall have been revoked or annulled shall not thereafter be entitled to a license under any provision of this chapter. On any examination, pursuant to a notice to show cause as aforesaid, the licensee may be a witness in his own behalf."

This section purports to be based on section 1476 of the Greater New York Charter.

The defendants have been engaged as ticket speculators or brokers for many years. The record shows that some of these brokers have been in that business for fifty years. Many of them have entered into leases for long terms. They employ many clerks, bookkeepers and messengers, and in order to conduct their business efficiently and with dispatch they are required to operate an extensive telephone service so as to have facile connection with their patrons and with the public generally.

The brokers have a regular clientele, many of whom have credit accounts. They claim to be engaged in an occupation of great usefulness because they render a service to that part of the public who are desirous to attend the theatre or the opera on short notice, and who would otherwise be likely to be disappointed in their efforts, with the result that they suffer no loss of time or delay as is usually the case when one seeks to purchase a ticket at the box office of the theatre.

They also claim that strangers who sojourn at the many hotels of this city and who seek to witness entertainments of the stage find it practically impossible during the height of the season to attend a theatre were it not for ticket agencies which are to be found in the principal hotels, and that many persons from other cities are enabled through these brokers to arrange by telephone or telegraph for the purchase of tickets in anticipation of their coming to the city.

The men engaged in this business conduct it at a great financial risk, because they are required to have on hand a large supply of tickets irrespective of the demand for them in order to accommodate their customers. If the theatrical production proves to be unpopular, or if they are unable to sell the tickets, the loss falls upon them and not upon the public, except possibly where there might be a secret arrangement or alliance between the theatre managers and the ticket brokers, concerning which, however, the record is silent.

The defendants offered proof to the effect that although the

gross profits of the sale of tickets by the United Theatre Ticket Company for the month of September, 1918, amounted to $3,624.60, the expenses charged against those profits amounted to $3,582.75, so that the net earnings amounted to only $41.85. While the net earnings in some months were much larger, and the brokers enjoyed a fair return upon their investments, nevertheless, when one considers the possibility of a total loss in other months, the nature of their service and the comparatively small net return to them, it is urged that an arbitrary limitation of a charge of fifty cents above the price charged by the theatre is unreasonable.

The defendants refused to procure licenses because they claim that the price-fixing provision of the ordinance interfered with their right to carry on a lawful business, that a license would be of no benefit or advantage to them because it could be revoked for selling tickets in violation of this provision; that such violation is made the only ground of revocation and no appeal can be taken by the licensee; that when a license is once revoked the licensee is not thereafter entitled to a renewal, and that all of these unreasonable and arbitrary restrictions constitute a deprivation of their constitutional rights to earn their livelihood and to hold and enjoy their property.

The price-fixing provision of the enactment is now challenged by the defendants as void under the Fourteenth Amendment to the Federal Constitution and under section 6, article 1 of our State Constitution, which guarantee all persons against deprivation of their liberty and property without due process of law.

It is unnecessary to define the terms " liberty," " property " and " due process of law." These terms " have been so often judicially defined that there can be no misunderstanding as to their meaning." Ives v. South Buffalo Ry. Co., 201 N. Y. 271, and the cases cited therein.

The price-fixing ordinance is not without precedent, but wherever an attempt has been made by legislation to fix the price of theatre tickets, such legislation has been declared to be

repugnant to the Constitution, either upon the ground that the legislation could not be sustained within the exercise of the police power of the state in the interest of the public welfare, or because the business of conducting a theatre, even if clothed with a public interest, was not within the purview of the doctrine laid down in Munn v. Illinois, 94 U. S. 113, or upon both such grounds. People v. Steele & Altschul, 231 Ill. 340; 14 L. R. A. (N. S.) 361; Ex Parte Quarg, 5 id. 183; City of Chicago v. Powers, 231 Ill. 560.

In People v. Steele & Altschul, supra, the defendant Steele, a manager of a theatre, was convicted of selling a theatre ticket not having printed thereon the words: " This ticket cannot be sold for more than the price printed hereon " and the defendant Altschul was convicted of selling a ticket at a price in excess of the advertised or printed rate therefor, which acts constitute a misdeameanor under the laws of the State of Illinois.

The Supreme Court of that state held such legislation unconstitutional, upon the ground that it interfered with the liberty and property of a citizen.

Inasmuch as the views of that court affect the ultimate decision to be arrived at in the instant cases, I deem it important and necessary to quote at length from this opinion.

In these cases, Mr. Justice Dunn said: " The legislature has the same authority over the theatre business as over any other lawful private business, and no more. Besides the requirement of a license, it may interfere with and regulate the business to the extent that the public health, safety, morality, comfort, and general welfare require. This is the exercise of the police power which this court has said may be said to be that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society. Town of Lake View v. Rose Hill Cemetery Co., 70 Ill. 191; City of Chicago v. Gunning System, 214 Ill. 628. In Toledo, Wabash & W. R. Co. v. City of Jacksonville, 67 Ill. 37, it was

held that, if the law prohibits that which is harmless in itself, or requires that to be done which does not tend to promote the health, comfort, safety or welfare of society, it will in such case be an unauthorized exercise of power, and it will be the duty of the courts to declare such legislation void. In Ritchie v. People, 155 Ill. 98, it was said (p. 110) : ' The police power of the state is that power which enables it to promote the health, comfort, safety and welfare of society. It is very broad and farreaching, but is not without its limitations. Legislative acts passed in pursuance of it must not be in conflict with the constitution and must have some relation to the ends sought to be accomplished, that is to say, to the comfort, welfare, or safety of society. Where the ostensible object of an enactment is to secure the public comfort, welfare, or safety, it must appear to be adapted to that end. It cannot invade the rights of person and property under the guise of a mere police regulation when it is not such in fact; and, where such an act takes away the property of a citizen or interferes with his personal liberty, it is the province of the courts to determine whether it is really an appropriate measure for the promotion of the comfort, safety and welfare of society.'

" While the legislature may determine when the exigency exists for the exercise of the police power, it is for the courts to determine what are the subjects for the exercise of this power, and it is necessary that the act should have some reasonable relation to the subjects of such power. The court must be able to see that the act tends in some degree to the prevention of offenses or the preservation of the public health, morals, safety or welfare. It must be apparent that such end is the one actually intended, and that there is some connection between the provisions of the law and such purpose.   *   *   *

" The statute prohibits the sale of a theatre ticket at a price above the printed rate and prohibits the establishing of an agency for such sale. There is nothing immoral in the sale of theatre tickets at an advance over the price at the box-office.

Such sale is not injurious to the public welfare and does not affect the public health, morals, safety, comfort or good order. It does not injure the buyer or the proprietor of the theatre. The buyer purchases voluntarily. He is under no compulsion. If the conducting of a theatre is a mere private business, there is no reason why the proprietor may not sell the tickets when and where, at what prices, and on what terms, he chooses. It is insisted, however, that the operation of a theatre is a business affected with a public interest, and therefore is subject to control by the legislature. It is a well-established doctrine that where the owner of property has devoted it to a use in which the public has an interest, he, in effect, grants to the public an interest in such use, and must to the extent of that interest submit to be controlled by the public for the common good, so long as such use is maintained. Munn v. Illinois, 94 U. S. 113; Inter-Ocean Co. v. Associated Press, 184 Ill. 438; New York & Chicago Grain & Stock Exchange v. Board of Trade, 127 Ill. 153. The fact that a license is required does not make the business a public employment. The cases where a business has been regarded as affected with a public interest have been cases where the person or corporation engaged in the business was acting under a franchise or cases affecting trade and commerce, where either there has been a virtual monopoly of means of transportation or methods of commerce (Munn v. Illinois, supra), or where, from the nature of the business, in its regular course, the person carrying it on was necessarily intrusted with the property or money of his customer (Hawthorn v. People, 109 Ill. 302; Meadowcroft v. People, 163 Ill. 56; Lasher v. People, 183 Ill. 226); or where the business has been conducted in such a manner that the public and all persons dealing in the products concerned have adapted their business to the methods used, so that such methods have become necessary to the safe and successful transaction of business. New York & Chicago Grain & Stock Exchange v. Board of Trade, supra, and Inter-Ocean Co. v. Associated Press, supra.

"In Millett v. People, 117 Ill. 294, where it was claimed that the business of mining for coal was affected with a public use, and subject, therefore, to regulation by law, the court said (p. 303): 'It cannot be claimed that mining for coal was by the common law affected with a public use and therefore specially regulated by law, like the business of innkeepers, common carriers, millers, etc., and in our opinion it is not, like the business of public warehousing, within the principle controlling such classes of business. The public are not compelled to resort to mine owners any more than they are compelled to resort to the owners of wood or turf, or even to the owners of grain, domestic animals, or to those owning any of the other ordinary necessaries or conveniences of life which form a part of the commerce of the country.' * * *.

"The act prohibits a sale of a ticket by the manager of a theatre without the requirement on its face that it shall not be re-sold at an advance, it prohibits the sale of a ticket at an advance, and it prohibits the keeping of a place for such sale. If the manager finds it profitable to have tickets on sale at different places, he may not sell at the regular price to brokers who maintain offices at such places and get their expenses and profits out of the advance in price on their re-sale of the tickets. The broker's business is prohibited, because it has been made unlawful to make a profit. The public is no better nor worse off in health, morals, security or welfare. These are arbitrary and unreasonable interferences with the rights of the individuals concerned. The business of the broker in theatre tickets is no more immoral or injurious to the public welfare than that of the broker in grain or provisions. If he does not make the price satisfactory to intending purchasers they are under no compulsion to buy. They have no right to buy at any price except that fixed by the holder of the ticket. The manager may fix the price arbitrarily, and may raise or lower it at his will. Having advertised a performance, he is not bound to give it, and, having advertised a price, he is

not bound to sell tickets at that price. It is immaterial to determine whether a theatre ticket is either transferable or revocable. The fact is, that the bearer of the ticket is admitted to the performance. The business of dealing in theatre tickets is carried on to some extent at least, and the right to do so and to contract in regard to such tickets is a right in which those who use it are entitled to be protected."

In Ex Parte Quary, supra, the defendant was convicted of a violation of the Penal Code which made it a misdemeanor for any person to sell or offer for sale any ticket of admission to a theatre or other public place of amusement at a price in excess of that charged originally by the management of such theatre or public place of amusement.

The court in declaring this penal provision void as an unwarrantable interference with the inherent and constitutional rights of an individual said: " It is, perhaps, not important in this case to consider and define the precise nature of a theatre ticket. It may be either a mere license, revocable at the will of the proprietor of the theatre, or it may be evidence of a contract whereby, for a valuable consideration, the purchaser has acquired the right to enter the theatre and observe the performance, on condition that he behaves properly. These are matters which concern only the proprietor and the purchaser. No third person can question the right of the purchaser. However, by the act of 1893 (Stat. 1893, chap. 185, p. 220), a ticket of admission to a public place of amusement, when sold, is made, at least, an irrevocable license to the purchaser of the ticket to occupy a place therein during the performance. Greenberg v. Western Turf Asso., 140 Cal. 360, 73 Pac. 1050. Such a ticket, therefore, represents a right, positive, or conditional, as the case may be, according to the terms of the original contract of sale. This right is clearly a right of property. The ticket which represents that right is also, necessarily, a species of property. As such, the owner thereof, in the absence of any condition to the contrary in the contract by which he obtained

it, has the clear right to dispose of it, to sell it to whom he pleases and at such price as he can obtain.   The statute in question forbids any sale for a price higher than that at which it was sold by the proprietor of the theatre; and to that extent it infringes upon the right of property guaranteed by the Constitution and existing in the individual.   It is therefore a void enactment, unless it can be upheld as an exercise of the police power.

" The police power is broad in its scope, but it is subject to the just limitation that it extends only to such measures as are reasonable in their application, and which tend in some appreciable degree to promote, protect, or preserve the public health, morals, or safety, or the general welfare.   The prohibition of an act which the court can clearly see has no tendency to affect, injure, or endanger the public in any of these particulars, and which is entirely innocent in character, is an act beyond the pale of this limitation; and it is therefore not a legitimate exercise of police power.   The sale of a theatre ticket at an advance upon the original purchase price, or the business of reselling such tickets at a profit, is no more immoral, or injurious to public welfare or convenience, than is the sale of any ordinary article of merchandise at a profit.   It does not injure the proprietor of the theatre; he must necessarily have parted with the ticket at his own price and upon his own terms before such resale can be made.   It does not injure the second buyer; he must have had the same opportunity as the first buyer to purchase a similar ticket, and no greater right thereto; and, having neglected that opportunity, or being unwilling to undergo the necessary inconvenience, and willing to pay a higher price rather than forego the privilege which the other by his greater diligence and effort has obtained, the transaction is just so far as he is concerned."

The case of People v. Thompson, 283 Ill. 87, cited by the learned assistant district attorney, has no bearing on the question herein involved.

This conclusion will be apparent when the facts are briefly stated.

In the Thompson Case, supra, the court passed upon an ordinance regulating the granting of a license to conduct a theatre in the city of Chicago. The ordinance provided: "That every ticket of admission to a theatre shall have printed upon its face the price thereof, and that no licensee, and no officer, manager or employee of any licensee, shall directly or indirectly receive any consideration, of any nature whatsoever, upon the sale of any such ticket beyond or in excess of the price designated thereon, or directly or indirectly enter into any arrangement or agreement for the receipt of such consideration."

That court in passing upon the Steele & Altschul and Quarg Cases said: "Counsel for the appellee object to the ordinance because they say that it is not aimed at the prevention of fraud and misrepresentation but is an attempt to destroy the business of ticket brokers, while at the same time they complain that the ordinance will interfere with the arrangements which they claim a constitutional right to make. No ticket broker or scalper is concerned with this suit and none is represented by the appellee, and if the ordinance merely prohibits the innocent business of ticket brokers the appellee will not be harmed. The argument, however, concerning the rights of ticket brokers to buy and sell tickets and the right of appellee to sell to them is an effort to raise a false issue in no manner involved in the question whether the court erred in sustaining the demurrer to the answer. The answer alleged that the license was refused because appellee would not agree to obey the requirement of the ordinance for impartial treatment of ticket buyers and to stop the practices set forth in the answer. There is nothing in the answer about purchasers of tickets, whether brokers or not, or their right to re-sell tickets at a profit. The manifest object of the ordinance is to compel impartial treatment of all buyers of tickets by the licensee. It is so interpreted by counsel for

the appellants. The corporation counsel in his brief and argument says:

" ' The purchaser of such tickets, so far as this ordinance is concerned, may re-sell them at an advanced price or do anything else with them which he may desire to do.'

" Considering the whole ordinance with its evident purpose, it does not prohibit sales to brokers or any other class of persons, but is designed to prevent theatre owners from entering into such arrangements as are stated in the ordinance."

It is, therefore, obvious that the decision in the Thompson Case, instead of modifying or affecting the principles declared in the Steele & Altschul and Quarg Cases, reaffirmed them.

In this state the courts have been called upon to determine the relative rights of the proprietor of a theatre and a ticket speculator or broker.

It has been held that the proprietor of a theatre *may charge what he chooses for admission to his place of amusement;* that he may regulate the terms of admission in any reasonable way, except where his rights are restricted by the statute commonly known as the Civil Rights Act; that: " A theatre ticket is a license, issued by the proprietor pursuant to the contract as convenient evidence of the right of the holder to admission to the theatre at the date named," and " The license, although granted for a consideration, is revocable for a violation of such condition by the holder of the ticket in the manner specified therein;" that the fact that the theatre is licensed by the city authorities " cannot change the inherent nature of a theatre ticket," and that if any of the terms made by the proprietor of a theatre are not satisfactory " no one is obliged to buy a ticket." Collister v. Hayman, 183 N. Y. 250.

With reference to a ticket speculator it has been decided that his business is protected by the Constitution as a lawful occupation (People v. Marks, 64 Misc. Rep. 679, opinion by my learned associate Judge Mulqueen); that " a ticket speculator is one who sells at an advance over the price charged by the

management;" that "neither the license to the owner of the theatre nor the license of the ticket speculator adds to or takes from the rights of the parties to the contract made when the proprietor sells a ticket;" that "the rights of the purchaser and the duties of the proprietor are measured by the terms of the contract as in fact made;" and that "there is no tendency toward monopoly, for any one can buy and sell theatre tickets provided the sales are not made on the sidewalk" (Collister v. Hayman, supra); nor upon any street.   City Ordinances, § 12.

Even if we had no precedents to follow as to the constitutionality of an ordinance passed by the board of aldermen limiting the price at which a theatre ticket may be sold above that fixed by the management of the theatre, the law laid down in the case of Collister v. Hayman, supra, would be a safe chart to guide this court in declaring the lack of power on the part of the board of aldermen to sweep away the constitutional safeguards which surround those engaged in a lawful business.

In this connection it might be said that the court in People v. Steele quoted with approval the law declared in the case of Collister v. Hayman.

It is manifest that the business of a ticket speculator is only made possible through the existence of the theatre and the willingness of its proprietor to sell him tickets upon such terms and conditions as are advantageous to both.

Since "Neither the license to the owner of the theatre nor the license to the ticket speculator adds to or takes from the rights of the parties to the contract made when the proprietor sells a ticket," and "the privilege accorded by the city authorities cannot change the inherent nature of a theatre ticket" and since the owner can charge what he chooses for admission to his theatre, then upon no conceivable theory can it be cogently urged that a ticket speculator can be inhibited from selling the tickets containing no restrictions in the contract against selling them at a limited price in advance of the original purchase price.

If there be no restraint upon the vendor of a theatre ticket—proprietor of the theatre—to sell it at any price that he may ask, provided he prints on the ticket the price thereof, then the board of aldermen cannot lawfully place a restraint upon the vendee—ticket broker—for that would be denying to him the equal protection of the laws.

" Restraint by statute and restraint by contract are quite different.    What the parties to a contract agree upon is valid almost without limitation, but what the legislature may prohibit parties from agreeing upon is subject to the limitations of the fundamental law."    Collister v. Hayman, supra.

" The right to buy, sell, barter and exchange property is a necessary incident to its ownership, and subject to reasonable regulations, is as much protected by this provision of the constitution as is the ownership itself."    City of Carrollton v. Bazzette, 159 Ill. 283; cited with approval in People ex rel. Moskowitz v. Jenkins, 202 N. Y. 53.

" Every one has the right to adopt such means to sell his goods and conduct his business as he finds most profitable to him, provided those means are honest, and the fact that some persons engaged in the same business are dishonest does not justify legislation prohibiting either directly or indirectly the business."    People ex rel. Moskowitz v. Jenkins, supra; People ex rel. Tyroler v. Warden, 157 N. Y. 116; Wright v. Hart, 182 id. 330.

It has already been pointed out in People v. Steele, supra, that the Illinois court refused to apply the principle laid down in Munn v. Illinois, supra, to the effect that where a business is clothed or affected with a public interest the state may regulate the maximum rate which may be charged by such a business, upon the ground that a theatre *is a mere private business,* and the fact that a license was required did not make the business of a theatre a " public employment."

That court also said that the cases where a business has been regarded as affected with a public interest have been cases

where a person or a corporation engaged in the business was acting under a franchise or those affecting trade and commerce.

There is no doubt that the business of owning, controlling and leasing theatres and producing plays and entertainments of the stage and booking contracts for the production of plays is not commerce.

That question was passed upon in People v. Klaw, 55 Misc. Rep. 72, 21 N. Y. Crim. 353, which was cited with approval by Mr. Justice Pendleton in the case of Metropolitan Opera Company v. Hammerstein. The Appellate Division of this department unanimously affirmed this decision. 162 App. Div. 691.

That a theatre is a private business and in no sense a public enterprise is no longer an open question in this state. Woollcott v. Shubert, 217 N. Y. 212; Collister v. Hayman, supra; People ex rel. Burnham v. Flynn, 189 N. Y. 180, 21 N. Y. Crim. 449.

In Woollcott v. Shubert, supra, the court said: " At the common law a theatre, while affected by a public interest which justified licensing under the police power or for the purpose of revenue, is in no sense public property or a public enterprise. It is not governed by the rules which relate to common carriers or other public utilities. The proprietor does not derive from the state the franchise to initiate and conduct it. His right to and control of it is the same as that of any private citizen in his property and affairs. * * * His rights at the common law, in the respect of controlling the property, entertainments and audience, have been too recently determined by us to be now questionable."

In Collister v. Hayman, supra, the court said: " A theatre may be licensed like a circus, but the license is not a franchise and does not place the proprietors under any duty to the public, or under any obligation to keep the theatre open. * * * The defendants were conducting a private business which, even if clothed with a public interest, was without a franchise to

accommodate the public, and they had the right to control it the same as the proprietors of any other business, subject to such obligations as were placed upon them.  *  *  *  Unlike a carrier of passengers, for instance, with a franchise from the state and hence under obligation to transport any one who applies and to continue the business year in and year out, the ·proprietors of a theatre can open and close their place at will and no one can make lawful complaint."

The learned assistant district attorney presses upon my attention the case of the German Alliance Ins. Co. v. Kansas, 233 U. S. 389.  That case needs no explanatory or fortifying comment to demonstrate that there is a vast difference between the business of a theatre or ticket speculator (private enterprise) and the business of fire insurance (public enterprise). In that case the court held that the business of fire insurance is so far affected with a public interest that the state has the power not only to regulate the business, but that the premium or price to be paid to the insurer for entering into contracts of fire insurance can be fixed by law.

In the course of the opinion, the court said:  " Indeed, it may be enough to say, without stating other effects of insurance, that a large part of the country's wealth, subject to uncertainty of loss through fire, is protected by insurance.  This demonstrates the interest of the public in it, and we need not dispute with the economists that this is the result of the ' substitution of certain for uncertain loss ' or the diffusion of positive loss over a large group of persons, as we have already said to be certainly one of its effects.  We can see, therefore, how it has come to be considered a matter of public concern to regulate it, and governmental insurance has its advocates and even examples.  Contracts of insurance, therefore, have greater public consequence than contracts between individuals to do or not to do a particular thing whose effect stops with the individuals.  *  *  *

" We have shown that the business of insurance has very definite characteristics, with a reach of influence and conse-

quence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. * * *

" How necessary their solvency is, is manifest. On the other hand, to the insured insurance is an asset, a basis of credit. It is practically a necessity to business activity and enterprise. It is, therefore, essentially different from ordinary commercial transactions, and, as we have seen, according to the sense of the world from the earliest times—certainly the sense of the modern world—is of the greatest public concern. * * *

" How can it be said to have the privilege of a private business when its dividends are ' restricted, its investments controlled, the form and extent of its contracts prescribed, discrimination in its rates denied and a limitation on its risks imposed ?"

The deduction to be made from this decision is that the fire insurance legislation was upheld upon the principle that where a broad public interest exists in a business and the circumstances connected with it are so affected and clothed with a public use as to make the conduct of the business different from that of the ordinary businesses of the commercial world, then such legislation is not violative of the Constitution, but inasmuch as the business of a theatre is not a public enterprise affected with a public interest within the reasoning of the Munn and German Alliance Insurance Company cases, then it must necessarily follow that the business of its offshoot, the ticket speculator or broker, cannot come within that category.

Statutes fixing prices have been held to be void in the following cases: Ex Parte Dickey, 144 Cal. 234 (fixing the price to be charged by an employment bureau) ; Brazee v. Michigan, 241 U. S. 340 (limiting the fee to be charged by an employment agency) ; and State v. Fire Creek Coal & Coke Co., 33 West Va. 188 (limiting the profits on sales to employees).

There is no question that the state may fix the rates in connection with many enterprises, such as canals, water ways:

bridges, ferries, wharves, docks, grain elevators, stockyards; telegraph, telephone, electric, gas and oil lines; turnpikes, railroads and the various forms of common carriers, including express and cab companies, but these enterprises have always been treated as public businesses and, therefore, justifying the power of the state of fixing the prices to be charged by the persons or corporations engaged therein.

It is asserted that inasmuch as the specific charge against each of the defendants is that he was " engaged in the business of ticket selling without having obtained a license," therefore the provision of the ordinance restricting the price which the ticket broker may charge for a theatre ticket is not involved in the decision of these cases.   Dollar Co. v. Canadian C. & F. Co., 220 N. Y. 270, 283.

The answer to this contention by the learned counsel representing the defendants is that the entire framework of section 11a, the language in which it is couched, the unity of thought which runs through all of its clauses, and the futility of a license unless it permits the licensee to do that which is lawful, mark this as a case for the application of the principle that where all the provisions of an ordinance are connected as parts of a single scheme, and part of it is violative of the Constitution, and the valid and objectionable parts of it are so interwoven and mutually dependent that they are impossible of a severance and require the belief that the legislature or board of aldermen would not have enacted the good part without the bad, then the entire ordinance must be declared invalid.   36 Cyc. 977; Hauser v. North British & Mercantile Ins. Co., 152 App. Div. 91; affd. 206 N. Y. 455; Rathbone v. Wirth, 150 id. 459.

It is argued, however, by the learned assistant district attorney that even if the price-fixing provision of section 11a of the ordinance be stricken out, the ordinance may still be held to be valid to the extent of conferring power on the board of aldermen to require a ticket speculator to procure a license, because the defective provision in this section of the ordinance does

not reach the whole of it. 19 R. C. L. "Constitutional Law," § 121; Ashley v. Three Justices of Superior Court, 228 Mass. 63, 81; Commonwealth v. Slocum, 230 id. 180, 191; Berea College v. Kentucky, 211 U. S. 45, 55, the court quoting from Loeb v. Columbia Township Trustees, 179 id. 472, 490; Brazee v. Michigan, 241 id. 340, 344.

On this phase of the case it is appropriate to quote the oft-repeated words of Judge Cooley in his work on Constitutional Limitations: "If a statute attempts to accomplish two or more objects, and it is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the legislature intended them as a whole, and if all could not be carried into effect, the legislature would not pass the residue independently, then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected, must fall with them." Pp. 178, 179.

The question, therefore, arises what was the true and underlying purpose which persuaded the board of aldermen to enact section 11a? Was it the suggestion that this enactment was necessary in order to prevent the ticket speculator from exacting extortionate prices from the public, or was it enacted for the purpose of licensing the ticket speculator?

A brief history of the ordinances upon this subject will clearly reveal that the latter purpose was not the inducement, but that the former was.

For many years prior to January 15, 1909, a ticket speculator, selling tickets on the streets, was required to pay a license fee of fifty dollars, and any person engaged in that business without procuring a license therefor was subject to a penalty

of not less than two dollars and not more than twenty-five dollars for each offense. On December 1, 1908, the board of aldermen repealed the ordinance relating to ticket speculators and the repeal was approved by the mayor on December 15, 1908, and went into effect thirty days thereafter, namely, on January 15, 1909. People v. Marks, supra. On February 16, 1911, the mayor approved of an ordinance passed by the board of aldermen prohibiting any person from conducting the business of a ticket speculator upon any street, and any person convicted of a violation of this provision was punishable by a fine of not more than ten dollars or by imprisonment for a term not exceeding ten days, or by both such fine and imprisonment. From January 15, 1909, up to December 28, 1918, on which latter date section 11a, supra, went into effect, the business of a ticket speculator in the city of New York was conducted without any license.

While prior to January 15, 1909, a ticket speculator, selling tickets on the streets, was required to pay a license fee of fifty dollars, a careful examination of the ordinances discloses that at no time until the passage of the new ordinance on December 28, 1918, was he required to pay a license fee for conducting his business in an office, agency or other place.

When we consider that the licensing feature of the ordinance was not passed to correct the abuses incident to selling tickets on the streets because a salutary ordinance already prevented the ticket speculator from doing so; that for ten years the ticket speculator was permitted to do business without a license; that a speculator selling tickets on the streets was only required to pay a nominal license fee of fifty dollars yearly; that the ticket speculator who conducted an office, agency or other place was never required to procure a license; and, that now, for the first time, he is called upon to pay a license fee, it becomes clear that the controlling reason for enacting section 11a was to limit the price at which a ticket broker may sell a ticket, and that the licensing feature of this section was only secondary to the

main purpose of the plan of the board of aldermen to limit the price which could be charged by the ticket broker.

That this was the primary purpose for the enactment of section 11a of the ordinance is further made clear because a violation of the price-fixing provision by the licensee may result in the revocation of the license and subject the offender to fine and imprisonment.

No other ground for revocation of the license provided for is recognized than for a violation of the price-fixing provision contained in section 11a. Of what avail would be a license if it is at once revocable for a violation of a prohibition which constitutes a deprivation of a constitutional right?

There is no provision in the ordinance to punish any ticket speculator who deceives any purchaser of a ticket by misstating or misrepresenting what is secured to the purchaser by the ticket sold as was the case under section 350 of the ordinance as it existed in 1908. People v. Marks, supra.

Furthermore, the main object of section 11a of the ordinance and the method by which that object is sought to be attained are so inter-related that it cannot reasonably be presumed that it was intended that the licensing feature should survive the nullification of the real object, namely, the price-fixing provision which called section 11a of the ordinance in its entirety into existence. A license that is to be terminable for the sole reason that the licensee receives for the tickets sold by him a sum in excess of that permitted by the section cannot be said to subserve any other purpose than that of giving effect to the limitation of the right to dispose of theatre tickets at a price greater than that specified in that section of the ordinance.

From what has been said the conclusion must necessarily follow that the two provisions of section 11a of the ordinance are so connected with and dependent upon each other as to warrant the belief that the board of aldermen intended them as a whole, and that if both provisions could not be carried into effect, the board of aldermen would not have passed the licensing

provision independently, and inasmuch as the price-fixing provision is unconstitutional, and the licensing provision depends upon it for its enforcement, this provision being connected with the invalid part of the ordinance must fall with it.   Or, to state it in another way, " Where the void matter is so blended with the good that they cannot be separated, or where the court can judicially see that the Legislature only intended the statute to be enforced in its entirety, and that by rejecting part the general purpose of the statute would be defeated, the court, if compelled to defeat the main purpose of the statute, will not strive to save any part."   (Lawton v. Steele, 119 N. Y. 226, 241.)

The principles herein enunciated are supported by the following authorities: Hauser v. North British & Mercantile Ins. Co. (152 App. Div. 91, affd., 206 N. Y. 455); Rathbone v. Wirth (150 id. 459, 477, 479); Jones v. Jones (104 id. 234, 235); Matter of Metz v. Maddox (189 id. 460, 472); Pollock v. Farmers' Loan & Trust Co. (158 U. S. 601, 635); Employers' Liability Cases (207 id. 463, 501); Matter of Sherrill v. O'Brien (188 N. Y. 185); Brooks v. Hydorn (76 Mich. 273); Darby v. City of Wilmington (76 N. C. 133); Robert v. San Francisco Police Court (148 Cal. 131); People v. Olsen (204 Ill. 494); Griffin v. State (119 id. 520); Albright v. Sussex County Lake & Park Commission (71 N. J. L. 309); City of Chicago v. Gunning System (114 Ill. App. 377, affd., 214 Ill. 628); Wiesenthal v. Atlantic City (73 N. J. L. 245); City of Jacksonville v. Ledwith (26 Fla. 163).

In Hauser v. North British & Mercantile Insurance Co. (supra), the court said: " The question then arises whether the invalid provision may be rejected, and the rest of the act saved.   We would have no difficulty on that head if, instead of requiring the statement in the application for a certificate, the provision had simply been that a person obtaining such a certificate should make that his principal business.   In that case the invalid provision could be stricken from the act.   But

the requirement that the statement shall be made in the application necessarily implies that the superintendent of insurance shall not issue a certificate except upon an application containing the said statements. The act then provides in effect that a license must be obtained and that the superintendent shall not issue it except upon a statement that the applicant is engaged or intends to engage principally in the insurance business or in that business in connection with a real estate brokerage business. As that restriction is thus imposed upon the issuance of a certificate, it seems to us to be a necessary part of the scheme requiring a certificate at all. For how are we able to say whether the Legislature would have required a license without imposing that condition upon its issuance? Indeed, subdivision ' d ' is the only condition imposed, the other statements required in the application being merely descriptive of the applicant. While it is suggested that the superintendent of insurance should have ignored the invalid provision, and that he might be compelled by mandamus to issue a certificate to the plaintiff, that argument loses sight of the fact that the Legislature authorized him to issue a certificate only upon an application containing the said statement. It would hardly do to say that an administrative officer, acting upon the authority of the Legislature, should ignore the only condition imposed upon his action on the theory that the Legislature had no power to impose the condition, although but for it the authority itself might not have been conferred."

In Rathbone v. Wirth (supra), the court said: " It is argued, however, that the objectionable clauses can be stricken out, as null and void, and that the statute may remain valid to the extent of conferring power on the common council to appoint police commissioners. I do not see how that may be done, within any correct or salutary application of a rule which is frequently resorted to, to uphold the acts of the legislative department of government. It is only applicable where not only that which is vicious in the law is so distinct as to permit

13

of being severed from the rest, but where, the severance being made, enough remains to effectuate the object which the Legislature had in view. It will not do, to save legislative enactments from annulment, to strike out provisions which so clearly express the intention of the Legislature as to characterize the purpose of the act and make their presence essential to the existence of the statute.    *    *    *

"The main purpose of this statute was to bring about the appointment of a new police commission in such a way as that its body will be equally composed from two certain political elements dominant for the time in the common council. We cannot assume that the Legislature would have passed this act except as a whole and, therefore, it is our duty, for the reasons assigned, to declare it to be unconstitutional and void."

In Jones v. Jones (supra), the court said: . "After giving the point due consideration, we have concluded that the main object of the act of 1886 having failed, we should not divide it into parts, and sustain the portion which is claimed to obviate the necessity of an order allowing the appeal, but that all the provisions are connected as parts of a single scheme, and that the incidental provisions must fall with the failure of the main purpose of the act."

In Employers' Liability Cases (supra), the court said: "Where a statute contains provisions which are constitutional and others which are not, effect may be given to the legal provisions by separating them from the illegal. But this applies only to a case where the provisions are separable and not dependent one upon the other, and does not support the contention that that which is indivisible may be divided. Moreover, even in a case where legal provisions may be severed from those which are illegal, in order to save the rule applies only where it is plain that Congress would have enacted the legislation with the unconstitutional provisions eliminated. All these principles are so clearly settled as not to be open to controversy. They were all, after a full review of the authorities, restated

and reapplied in a recent case. Illinois Central Railroad v. McKendree, 203 U. S. 514, and authorities there cited."

Much has been said by the learned and distinguished counsel representing the defendants as to the lack of power of the board of aldermen to pass an ordinance relating merely to the provision of licensing a theatre ticket broker and requiring him to pay a license fee. He contends that the board has not been vested with this power by the charter of the city of New York, and that it does not possess it under the general provisions of the so-called Home Rule Act. He urges with much force, and cites many authorities to sustain his argument, that the legislature, under both of these provisions, has not vested in the board of aldermen any such broad grant of power so as to authorize it to license ticket speculators, even though it possesses the absolute authority to license a theatre. City of New York v. Dry Dock, East B. & B. R. R. Co., 133 N. Y. 104; 1 Dillon Mun. Corp. (4th ed.), §§ 89, 317, 361; Dunham v. City of Rochester, 5 Cow. 462; Commonwealth v. Stoddard, 2 Cush. 562; St. Paul v. Stoltz, 33 Minn. 233; 28 Cyc. 365-368; City of New York v. Seely-Taylor Co., 149 App. Div. 98, 105; affd. 208 N. Y. 548; People ex rel. Kieley v. Lent, 166 App. Div. 550; affd. without opinion, 215 N. Y. 626; Gibbs v. Luther, 81 Misc. Rep. 611; City of Geneva v. Fenwick, 159 App. Div. 621; Mollnow v. Rafter, 89 Misc. Rep. 495; People ex rel. Klinger v. Rand, 91 id. 276.

In view of my determination that the defect pointed out in section 11a of the ordinance reaches both the price-fixing and licensing provisions, this question need not be considered.

It is, however, necessary to determine whether the license fee was excessive and more than reasonably necessary to reimburse the city for the regulation and supervision of the business of a ticket broker.

It is essential to the validity of an ordinance that its provisions shall be reasonable.

While the reasonableness of an act of the legislature may

not be questioned, this is not the case where the board of alder-men passes an ordinance upon a general or implied grant of power from the legislature. In the latter instance there must be a reasonable use of such power by the board of aldermen in the enactment of the ordinance, otherwise it may be declared invalid by the courts. Village of Carthage v. Frederick, 122 N. Y. 268, and cases cited therein; Matter of Stubbe v. Adam-son, 220 N. Y. 459; City of Yonkers v. Yonkers R. R. Co., 51 App. Div. 271; City of New York v. Dry Dock, East B. & B. R. R. Co., 133 N. Y. 104.

The fee for the license is fixed at $250, but it is provided that every license shall expire on the first day of May next ensuing the issuance thereof.

The ordinance went into effect December 28, 1918. The defendants were charged with having carried on business as ticket brokers on February 14, 1919, without a license; con-sequently, ticket brokers carrying on business after December 28, 1918, were required to pay $250 for a license which would expire May 1, 1919, and an additional fee of $250 after May 1, 1919.

Under section 1473 of the charter, the license fee for con-ducting a theatre is fixed at $500 per annum. The ticket broker during the year 1919 is required to expend $500 for carrying on his business, and the actual cost of the license for that year is $416.66.

While license fees are sometimes required in connection with the exercise of the police power, and the courts have sustained ordinances in connection with certain businesses where the license fee was not excessive, as in Price v. People, 193 Ill. 114 (employment agency, $200); Brazee v. Michigan, 241 U. S. 340 (employment agency, $100); and Gundling v. Chicago, 177 U. S. 183 (selling cigarettes, $100), nevertheless, the courts have declared ordinances invalid where the amount of the license fee, if more than is reasonably required for the cost of granting the license and proper police regulation, becomes a

revenue measure, and, therefore, an exercise of the power of taxation. It has, accordingly, been held that where the exaction has been imposed under the power to regulate or in the exercise of the police power as distinguished from the power to tax for revenue, the general rule obtains that the sum levied cannot be excessive or more than reasonably necessary to cover the cost of granting the license and proper police regulation. City of Mankato v. Fowler, 32 Minn. 364; 20 N. W. Repr. 361 (auctioneer, $300); People v. Jarvis, 19 App. Div. 466 (peddlers, $5 to $10 per day); Postal Telegraph Cable Co. v. Taylor, 192 U. S. 64 (charging excessive fee for inspecting telegraph poles).

But assuming, and not deciding, that the power was vested in the board of aldermen to enact an ordinance requiring a ticket broker to be licensed, it was unreasonable to require the licensee to pay $500 in the year 1919, even though the actual cost for that year was $416.66, particularly when we take into consideration the fact that at the time ticket brokers were allowed to sell tickets on the streets, they were only required to pay a license fee of $50. Indeed, there was more of a burden placed upon the police heretofore to supervise the business of a ticket broker than there is now when his business is conducted in an office or agency.

It, therefore, seems to me that the license fee for the year 1919 is more than necessary to reimburse the city for issuing the license to the ticket broker and for supervising his business.

In People v. Jarvis, supra, the court said: " It is a fundamental and well-settled principle of law that ' when a municipal corporation is given the power to *license* useful trades or occupations, it cannot use the license as a tax to raise revenue, nor is it authorized to entirely prohibit the exercise of the trade or occupation by any excessive license fee.' Such is the rule as stated in the American and English Encyclopaedia of Law (Vol. 13, p. 532), and it is fully sustained not only by the cases there cited, but by most writers on the subject, and many de-

cisions.    Dillon on Municipal Corporations (Vol. 1, § 357 [4th ed.], p. 424) says: ' Concerning useful trades and employments, a distinction is to be observed between the power to " license " and the power to " tax." In such cases the former right, unless such appears to have been the legislative intent, does not give the authority to prohibit, or to use the license as a mode of taxation with a view to revenue, but a reasonable fee for the license and the labor attending its issue may be charged.' Also, in Cooley on Taxation (2d ed., chap. 19, p. 408) the same rule is laid down. And, in discussing the terms which the statute should use to confer the power to tax, he says: ' It is, perhaps, impossible to lay down any rule for the construction of such grants that shall be general and at the same time safe, but as all delegated powers to tax are to be closely scanned and strictly construed, it would seem that when a power to *license* is given, the intendment must be that *regulation* is the object, unless there is something in the language of the grant, or in the circumstances under which it is made, indicating with sufficient certainty that the raising of *revenue* by means thereof was contemplated.' " See also, upon this subject, 2 Dillon on Mun. Corp. (4th ed.), §§ 763, 768; Dunham v. City of Rochester, 5 Cow. 462; City of Brooklyn v. Nodine, 26 Hun, 512.

In Postal Telegraph Cable Co. v. Taylor, supra, it was held that " A license fee cannot be imposed by ordinance of a municipality for purposes of inspection on telegraph companies doing an interstate business which is so far in excess of the expenses of inspection that it is plain that it was adopted, not to repay such expenses, but as a means for raising revenue."

In Mankato v. Fowler, supra, the court said: " What is a reasonable license fee must depend largely upon the sound discretion of the city counsel, having reference to all the circumstances and necessities of the case. The general rule is that a reasonable license fee should be intended to cover the expense of issuing it, the services of officers, and other expenses directly

or indirectly imposed. Unless, however, the amount is manifestly unreasonable, in view of its purpose as a regulation, the court will not adjudge it a tax. See 2 Am. & Eng. Corp. Cases, 29; Van Hook v. City of Selma, 79 Ala. 361; Van Baalen v. People, 40 Mich. 258; 36 Am. Rep. 522, note. * * *

"But the business of an auctioneer is a lawful and useful one, and there would seem to be no reasonable warrant, from its nature or the expenses that might be directly or indirectly incurred in regulating it, for exacting so large a sum as a license fee, the result of which, it appears, is not to regulate but to suppress such business. In view of the facts found, we think the trial court was warranted in holding the ordinance unreasonable as a regulation, and unauthorized as a tax."

In People ex rel. Moskowitz v. Jenkins, supra, the court said: "It is undoubtedly true that the legislature may impose on professions, callings, businesses and vocations license fees for the purpose of revenue, and though termed license fees, they are enacted not under the police power, but under the power of taxation. There exists also in the legislature the right to classify vocations or businesses for the purpose of taxation. One class may be taxed at one rate and another class at another rate. But the right to classify, though very broad, is not absolutely unlimited. * * *

"Treating the statute and the ordinance passed under it as an exercise of the taxing power (though I have no idea it ever was intended as such), the classification is plainly arbitrary and unreasonable."

Section 4, article 1, of chapter 3 of the ordinances is also attacked on the ground that it is unreasonable, inasmuch as it provides for the revocation and annulment of the license on the determination of a single judge or justice, but deprives the licensee of the right to appeal. This section purports to be based on section 1476 of the Greater New York charter, which is part of title 2, of chapter 22 of that instrument. This objection is well taken. Under such a provision a licensee may

be deprived of the means of earning his livelihood, his business may be destroyed, and his property rendered worthless by the summary decision of a single judge, however contrary to the law and fact it may be.

The legislature has the absolute right to regulate appeals, and, so far as the Constitution does not permit the right of appeal, to deny such right. People v. Dunn, 157 N. Y. 528, 539. It is clear that the legislature has not vested in the board of aldermen any specific grant of power which permits it to pass an ordinance containing a provision prohibiting a licensed ticket speculator from appealing from a decision revoking his license.

While section 1476 of the charter contains a provision which prohibits a licensee for a public exhibition to appeal, such provision does not confer any authority upon the board of aldermen to prohibit the right of a ticket speculator to appeal, because that section, supra, affects only a licensee to whom a license was granted for a public exhibition. Furthermore, section 1476 was a specific enactment by the legislature.

This shows beyond peradventure that it was not intended, in the absence of such express authority, by the legislature, to confer upon the board of aldermen the right to prohibit an appeal in the case of a ticket speculator.

There remains to be considered whether the learned magistrate erred in excluding evidence offered by the defendants for the purpose of showing the unreasonableness of the ordinance.

It is conceded that the ordinance was not passed pursuant to any specific authority of the legislature, and that it was not specifically adopted by that body after its enactment by the board of aldermen. This being so, the defendants had the undoubted right to offer evidence to support their claim that the legislation was unreasonable and oppressive.

The exclusion of this evidence was clearly in violation of the rule governing the right of a defendant to attack a mere ordinance adopted by the board of aldermen in pursuance of gen-

eral authority of the legislature. Anderson v. Steinway Sons, 178 App. Div. 507, 517; affd. 221 N. Y. 639; Matter of Stubbe v. Adamson, 220 id. 459.

In Anderson v. Steinway Sons (178 App. Div. 517), the court said: " It is well settled that in the case of an act of the Legislature, or of a municipal ordinance which has been expressly ratified by the Legislature, evidence may not, as a general rule, be introduced for the purpose of showing that the statute or ordinance is unreasonable and, therefore, unconstitutional, while in the case of an ordinance or municipal regulation, adopted under authority of the Legislature, but not specifically ratified after adoption, it may be attacked on the ground that it is unreasonable, and to support this claim evidence may be introduced."

In Matter of Stubbe v. Adamson (supra), the court said: " It is well settled that the rules governing an attack upon a mere ordinance adopted by municipal authorities in pursuance of general authority are quite different than those which are applicable to an attack upon a statute passed by the Legislature or an ordinance adopted under specific authority of the Legislature or approved by that body after adoption. Enforcement of a regulation having the force of an ordinary municipal ordinance passed under general authority may be opposed on the ground that the ordinance is unreasonable and evidence may be introduced for the purpose of establishing this defense (Mayor, etc., of N. Y. v. D. D., E. B. & B. R. R. Co., 133 N. Y. 104; Village of Carthage v. Frederick, 122 N. Y. 268), whereas in the case of a statute or of an ordinance having the force of a statute it is equally well settled as a general proposition that evidence may not be introduced for the purpose of showing that the statute or ordinance is unreasonable, and, therefore, unconstitutional. * * *

" Where, however, the power to legislate is general or implied, and the manner of exercising it is not specified, there must be a reasonable use of such power, or the ordinance may

be declared invalid by the courts.    (Village of Carthage v. Frederick, supra, p. 271.)"

In order that there should be no misunderstanding as to the questions passed upon, I deem it necessary to recapitulate the points decided, and this opinion is, therefore, limited to the following:

1. That the price-fixing and licensing provisions in relation to ticket brokers contained in section 11a of the ordinance are invalid;

2. That the license fee for the year 1919 is excessive and more than reasonably necessary to reimburse the city for the regulation and supervision of the business of a ticket broker;

3. That the board of aldermen was without power to enact a provision prohibiting a licensed ticket broker from appealing from a decision revoking his license; and,

4. That error was committed by the magistrate in excluding evidence offered by the defendants for the purpose of showing the unreasonableness of section 11a of the ordinance.

In deciding the questions involved in these cases, it must be understood that the provisions of sections 3, 3a and 12, of article 1, of chapter 3, of the Code of Ordinances were not considered, as those sections in no way affect the decision herein rendered; and no opinion is expressed thereon, for the further reason that the defendants not being injured by those sections cannot raise any objection as to their validity on behalf of persons who might be affected thereby.    Therefore those sections must stand.    For the same reasons the provision contained in section 11a which reads, " This section shall not be deemed to require a licensee under sections one and two of this article to obtain an additional license for the sale by him of tickets of admission to a licensed exhibition or performance conducted by him," must likewise stand, because this provision relates to a person exhibiting entertainments of the stage to the public.

I am not unappreciative of the fact that this ordinance was

passed in answer to a widespread public demand to prevent ticket brokers from charging extortionate prices for admission to theatres where popular entertainments are produced, the result being that persons of ordinary means find it almost impossible to purchase tickets for such plays or are required to wait weeks, if not months, before the privilege is accorded to them to witness such performance at a reasonable price.

Both the theatre and the ticket speculator thrive because the public is willing to pay any excessive price that may be asked.

There is no doubt that the evil flowing from this business should be corrected, but the relief unfortunately, for the reasons already pointed out, cannot come through the courts, for the courts are merely the interpreters of the law. In California and Illinois the people have sought to remedy a similar situation, but the legislation was declared to be unconstitutional.

The remedy, in my judgment, can come from the producing managers of the theatres. This can be accomplished through the medium of a contract entered into between the producing managers of the theatres and ticket brokers to sell tickets at reasonable prices. This arrangement can be made effective if the parties will act in good faith. Fixing reasonable prices for theatre tickets will not violate the law of monopoly because entertainments of the stage do not come within the inhibition of the anti-monopoly law. In fact, the entire subject is within the absolute control of the producing managers of the theatres as was pointed out in Collister v. Hayman.

Although this legislation is attractive and desirable, and meets, as it undoubtedly does, with popular approbation, courts are not permitted to approve of legislation which clearly infringes upon the letter and spirit of our Constitution. The business of a ticket speculator being concededly lawful, it is therefore under the constitutional protection.

The inalienable right of every citizen is to hold and enjoy his property until it is taken from him by due process of law,

and when one is restricted in the sale of his property on terms which are beneficial to him, it is tantamount to depriving him of the enjoyment of the same.

As was said by the Court of Appeals in Wright v. Hart (182 N. Y. 330, 344) : " It cannot be reiterated too often that the police power must be exercised within its proper sphere, and by appropriate methods.  Whenever a statute arbitrarily strikes down private rights, invades personal freedom or confiscates or destroys private property, it is repugnant to the Constitution and should not be permitted to stand, no matter how laudable its purpose or beneficial its effect."

This is the positive command of the highest court of this state, and in pursuance of such admonition I have been compelled to declare invalid the price-fixing and the licensing provisions in relation to ticket brokers contained in section 11a of the ordinance.

The judgment of conviction as to each of the defendants is reversed, and in as much as no new prosecution can be successfully maintained, the charge against each of the defendants is also dismissed.

Judgment reversed.